07-3719(L)
United States v. Bailey

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

—————

August Term, 2012

(Argued: June 19, 2013     Decided: February 21, 2014)

Docket Nos. 07-3719(L), 10-398(CON)

—————

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

CHUNON L. BAILEY, A/K/A POLO,

*Defendant-Appellant*.

—————

Before:

CABRANES, POOLER, and RAGGI, *Circuit Judges*

—————

On remand from the Supreme Court, see Bailey v. United States, 133 S. Ct. 1031 (2013), this court reconsiders defendant's Fourth Amendment challenge to a conviction based in part on evidence obtained when he was stopped by police about a mile from a residence that he had just departed and that was about to be searched pursuant to a judicial warrant.  The Supreme Court ruled that such a

1

detention was not incident to the authorized search so as to be reasonable pursuant to <u>Michigan v. Summers</u>, 452 U.S. 692 (1981), even without individualized probable cause or reasonable suspicion. But it left this court to decide on remand whether the detention was a reasonable investigatory stop under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). We now conclude that defendant's initial detention was reasonable under <u>Terry</u>, but ceased to be so when he was placed in handcuffs. Accordingly, while evidence obtained from defendant before handcuffing was lawfully obtained under <u>Terry</u>, evidence obtained thereafter was not. Nevertheless, we conclude that no vacatur for retrial is required because admission of the tainted evidence at trial was harmless beyond a reasonable doubt.

AFFIRMED.

Judge Pooler concurs in part and dissents in part in a separate opinion.

———————

> KANNON K. SHANMUGAM (Kristin A. Feeley, Williams & Connolly LLP, Washington, D.C.; Susan V. Tipograph, New York, New York, *on the brief*), Williams & Connolly LLP, Washington, D.C., *for Defendant-Appellant*.

> CHARLES P. KELLY (Peter A. Norling, *on the brief*), Assistant United States Attorneys, *for* Loretta E. Lynch, United States Attorney

for the Eastern District of New York, Brooklyn, New York,
*for Appellee*.

———————

R<small>EENA</small> R<small>AGGI</small>, *Circuit Judge*:

This case comes before us on remand from the Supreme Court. <u>See</u> <u>Bailey</u> <u>v. United States</u>, 133 S. Ct. 1031 (2013). Defendant Chunon L. Bailey was convicted on August 23, 2007, after a jury trial in the United States District Court for the Eastern District of New York (Joseph F. Bianco, *Judge*), of (1) possession of five grams or more of cocaine base with intent to distribute, (2) possession of a firearm in furtherance of a drug trafficking crime, and (3) possession of the same firearm as a convicted felon. <u>See</u> 18 U.S.C. §§ 922(g)(1), 924(c)(1)(A)(i); 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii). Bailey appealed his conviction on the ground that it was secured through inadmissible evidence obtained from him in the course of a constitutionally unreasonable detention. <u>See</u> U.S. Const., amend. IV. The district court had declined to suppress the evidence at issue, concluding that <u>Michigan v.</u> <u>Summers</u>, 452 U.S. 692 (1981) (recognizing detentions incident to authorized searches as reasonable), and <u>Terry v. Ohio</u>, 392 U.S. 1 (1968) (recognizing investigatory stops based on reasonable suspicion as reasonable), each independently defeated Bailey's Fourth Amendment challenge. <u>See</u> <u>United</u> <u>States v. Bailey</u> ("<u>Bailey I</u>"), 468 F. Supp. 2d 373 (E.D.N.Y. 2006). In affirming,

3

this court found it sufficient to rely on <u>Michigan v. Summers</u> without deciding whether <u>Terry v. Ohio</u> would also support affirmance. See <u>United States v. Bailey</u> ("<u>Bailey II</u>"), 652 F.3d 197, 207 n.7 (2d Cir. 2011). The Supreme Court reversed, holding that <u>Summers</u>'s detention-incident-to-search rule did not apply to this case because Bailey was not in "the immediate vicinity of the premises to be searched" when he was stopped. <u>Bailey v. United States</u> ("<u>Bailey III</u>"), 133 S. Ct. at 1042. The Court nevertheless recognized that <u>Terry</u>'s investigatory stop rule might provide an independent basis for detention. Expressing no view on that issue, the Court left it open for further consideration by this court on remand. See <u>id.</u> at 1043.

After further briefing and oral argument, this court now concludes that <u>Terry v. Ohio</u> independently supported Bailey's initial detention and patdown, but that his subsequent handcuffing exceeded the scope of a reasonable <u>Terry</u> stop in the circumstances of this case. Accordingly, while evidence obtained from Bailey before handcuffing—inculpatory statements, a driver's license, and a set of keys—was lawfully obtained and admissible at trial, exculpatory statements made by Bailey after handcuffing were not. We nevertheless

4

conclude that no vacatur for retrial is required because admission of the tainted statements was harmless beyond a reasonable doubt.

## I.   Background

While the facts of this case have been thoroughly detailed in prior opinions, we here reiterate those relevant to our decision today.

### A.   The Events of July 28, 2005

#### 1.   Procurement of a Warrant To Search the Basement Apartment at 103 Lake Drive, Wyandanch, New York

At 8:45 P.M. on July 28, 2005, Suffolk County Police Detective Richard Sneider applied for and obtained a warrant to search the basement apartment at 103 Lake Drive in Wyandanch, New York ("103 Lake Drive" or "the subject premises") for a chrome .380 handgun. Probable cause for the search was provided by a known, reliable informant who, in a sworn statement attached to the warrant application, avowed that, days earlier, while at the subject premises purchasing six grams of crack cocaine from "Polo," he had seen a chrome .380 caliber handgun along with drugs on a kitchen counter. The informant reported that he had also seen the gun on other occasions over the preceding two months, during which time he had made seven or eight drug purchases from "Polo" either at the subject premises or at "Polo's" prior residence in Bay Shore, New

York.  The informant described "Polo" as a dark skinned, heavyset, black male with short hair.

### 2. Police Stop of Bailey

#### a. Initial Detention

In anticipation of executing the search warrant at the subject premises, police conducted surveillance outside 103 Lake Drive.  At 9:56 p.m., Detective Sneider and his partner, Detective Richard Gorbecki, observed two black males—later identified as Bryant Middleton and defendant Bailey—exiting that location through a gate at the top of stairs leading up from the rear, basement level of the building.  Each man was approximately six-feet tall, with a stocky build and short hair.  Rather than immediately approach the men—and risk revealing police presence to any persons inside the subject premises, thereby affording them an opportunity to arm themselves or destroy evidence before the authorized search—the detectives watched the men enter a black Lexus parked in the driveway and leave the scene.  In an unmarked car, the detectives followed the Lexus for approximately one mile before pulling it over into the parking lot

of a fire station in order to "identify" the two men "and to see what their purpose was for being at the residence." Suppression Hr'g Tr. 16:25–17:1, App. 90.[1]

The detectives asked both men to step out of the car and proceeded to pat them down to determine if they were armed. Feeling hard objects in Bailey's front and back pockets, Sneider removed the items to ensure that they were not weapons. The objects were, in fact, a wallet and a set of keys, including keys for the stopped Lexus. The wallet was returned to Bailey; the set of keys was placed on the lid of the car trunk.

The detectives then asked the men their names and from where they were coming. The car's driver identified himself as Chunon Bailey and stated that he was coming from "my house." Id. 56:22–23, App. 122. Asked the location of his house, Bailey replied, "103 Lake Drive." Id. 56:25, App. 122. In response to a request for identification, Bailey produced a driver's license from his wallet bearing a Bay Shore address. Sneider knew that the informant had said that "Polo" had dealt drugs from his Bay Shore home before moving to 103 Lake Drive.

---

[1] It is undisputed that the officers did not pull the vehicle over based on probable cause to think the driver had committed any traffic infraction.

Meanwhile, Middleton identified himself to Detective Gorbecki and stated that Bailey lived at 103 Lake Drive and was driving Middleton home so that he would be in compliance with a 10:00 p.m. curfew condition of his parole.

### b. Post-Handcuffing Detention

At that point, the detectives handcuffed Bailey and Middleton. When Bailey asked why he was being arrested, the detectives told the men that they were not being arrested but were being detained, and that a search warrant was then being executed at 103 Lake Drive. To that, Bailey stated, "I don't live there. Anything you find there ain't mine, and I'm not cooperating with your investigation." Bailey III, 133 S. Ct. at 1036.[2]

All four men then returned to 103 Lake Drive: Bailey and Middleton, both handcuffed, in a summoned patrol car; Gorbecki driving the Lexus; and Sneider driving the unmarked police car. Upon their arrival, officers at the scene advised that a gun and drugs had been found in plain view in the basement apartment. Police then formally arrested Bailey and Middleton.

---

[2] This statement has been reported with slight (though not material) differences at various points in the record. For consistency with prior opinions, we reference the statement as testified to by Detective Gorbecki at the suppression hearing. See Bailey III, 133 S. Ct. at 1036; Bailey II, 652 F.3d at 201.

In total, less than ten minutes elapsed between the time officers first pulled over the Lexus and detained its occupants and the arrest. Sometime after Bailey and Middleton were arrested, Detective Sneider confirmed that one of the keys retrieved from Bailey's pocket opened locks to the subject premises.

B.     Procedural History

1.     Suppression Ruling

On April 6, 2006, a federal grand jury indicted Bailey for the three federal crimes on which he now stands convicted. Through counsel, Bailey moved to suppress all physical evidence and statements obtained from him during his July 28, 2005 detention, arguing that they were the fruits of an unlawful seizure of his person.

After conducting an evidentiary hearing, the district court denied the motion, holding that Bailey's detention, approximately one mile from a residence that he had just left and that was about to be searched pursuant to a warrant, was permissible under Michigan v. Summers, 452 U.S. 692. See Bailey I, 468 F. Supp. 2d at 382. Further, and as relevant here, the district court held that Bailey's brief detention was independently supported by reasonable suspicion of his criminal conduct and, therefore, lawful under Terry v. Ohio, 392 U.S. 1. See id. Insofar as

9

Bailey argued that his detention became a <u>de facto</u> arrest at least when he was placed in handcuffs, the district court disagreed, holding that such handcuffing was reasonable to assure officers' safety "given that the detectives were searching for a gun at the residence and Bailey came from that residence." <u>Id.</u> at 384. The district court further concluded that transporting Bailey back to his residence in a patrol car did not convert the stop into an arrest. <u>See id.</u> at 385.

### 2. Trial and Sentencing

The prosecution called four witnesses at Bailey's November 2006 trial. The confidential informant, Raheem Cannaday, testified to purchasing drugs from Bailey in the basement apartment at 103 Lake Drive as well as at a prior residence in Bay Shore, and to seeing a firearm at both locations. Detective Sneider testified about the stop and the match between a key retrieved from Bailey's person and the locks on 103 Lake Drive. Detective Daniel Fischer testified to items seized during the search of the subject premises, including weapons, ammunition, drugs, and various documents in Bailey's name.[3] He also

---

[3] Among the items seized were two operable handguns with bullets for each, an operable rifle, a bulletproof vest, 40.87 grams of crack cocaine, 39.9 grams of powder cocaine, and various items stipulated by the parties to be tools of the drug trade. Also seized from the subject premises were various letters, money receipts, pay stubs, and an identification card, all in Bailey's name.

10

testified to the presence of unpacked boxes in the apartment, suggesting that someone had recently moved in. Finally, Middleton, a hostile witness, testified that he knew Bailey by the name "Polo," knew that he previously resided in Bay Shore, had told police that he thought that Bailey had recently moved into the basement apartment at 103 Lake Drive, and had been with Bailey in that apartment on the night of July 28, 2005, before they were stopped by the police.

The defense sought to impugn the prosecution case through cross-examination suggesting that Cannaday was not credible and that the police investigation was deficient. Further, the defense maintained that Bailey did not reside in the basement apartment at 103 Lake Drive and that the guns, drugs, and drug paraphernalia seized therefrom did not belong to him.[4] In support, it called Meltona Sykes, the owner of the house at 103 Lake Drive. She testified that she had rented the basement apartment in June or July 2005 to a black male named Frederick Meyers, whom she thereafter saw coming and going from the apartment. She testified that Bailey did not live in the apartment, but that she recognized him as someone who occasionally visited Meyers there.

---

[4] Insofar as the prosecution maintained that documents found in the apartment bore Bailey's name, the defense noted the lack of corroborating documentation for such a seizure and suggested that the documents were retrieved from the Lexus rather than the apartment.

In their summations, the parties focused on Bailey's residency at 103 Lake Drive. The prosecution argued that residency could not seriously be disputed in light of the testimony of Cannaday and Middleton, documents seized from the premises bearing Bailey's name, Bailey's initial post-stop admission to residency, and his possession of a key that matched the apartment's locks. Insofar as Bailey denied residency after learning that the apartment was being searched, the prosecution maintained that the statement was false and urged the jury to infer that Bailey made it because he believed he was guilty.

As for Ms. Sykes's testimony that Frederick Meyers resided in the basement apartment and that Bailey was simply an occasional visitor, the prosecution argued that it was not credible, emphasizing the lack of documentary corroboration for Meyers's tenancy and Cannaday's testimony implicating Ms. Sykes and her sister in drug use.

Defense counsel, by contrast, argued not simply that there was reasonable doubt as to who resided in or controlled the subject premises, but that the evidence was "crystal clear" that Bailey did not. Summation Tr. 760:4–10. In support of this conclusion, the defense first highlighted evidentiary gaps in, and credibility concerns with, the prosecution case. It then urged the jury to

12

recognize that Ms. Sykes was the only disinterested, credible witness, and that she unequivocally testified that Bailey was not the tenant or resident of the basement apartment, but only an occasional visitor there. As for Bailey's own statements to the police disavowing residency or ownership of anything in the basement apartment, the defense maintained, "[h]e told them the truth." Id. 769:24–770:1. It submitted that what was suspect was police testimony that Bailey had initially admitted residency. The defense suggested that Bailey had originally told Detective Sneider that "he was coming from 103, not [from] my house," and that the officer had recast that exchange in a more incriminatory light after learning the results of the search. Id. 769:15–770:8. Thus, in its closing point to the jury, the defense argued that the jury could "see[] clearly" from the totality of the evidence "that Mr. Bailey did not control this apartment. . . . [H]e did not possess the items in that apartment." Id. 789:3–6.

After the jury found Bailey guilty on all crimes charged, the district court sentenced him to concurrent prison terms of 300 and 120 months, respectively, for possession with intent to distribute more than five grams of crack cocaine and for being a convicted felon in possession of a firearm, as well as a consecutive prison term of 60 months for possession of a firearm in furtherance of a drug

trafficking crime. The court also imposed concurrent terms of 5 years' and 3 years' supervised release and a total special assessment of $300.

### 3. Section 2255 Petition

On December 5, 2008, Bailey moved pursuant to 28 U.S.C. § 2255 for vacatur of his conviction and a new trial on the ground that trial counsel was constitutionally ineffective in pursuing suppression of evidence ultimately introduced at trial. Specifically, Bailey faulted counsel for failing to offer evidence that access to the basement door at the rear of 103 Lake Drive could be gained from either the basement apartment or the house upstairs. Bailey asserted that such a showing would have established that when Detectives Sneider and Gorbecki observed Bailey exit the gate on July 28, 2005, they could not have known whether he was leaving the basement apartment or the house upstairs. Bailey maintained that a conclusive showing that he had left the basement apartment was necessary to sustain his subsequent detention under either Michigan v. Summers or Terry v. Ohio. See Bailey II, 652 F.3d at 202.

The district court denied Bailey's motion, concluding that, even if counsel had made the urged showing, the detectives would still have had a reasonable basis to think that Bailey and Middleton had emerged from the basement

14

apartment for which they had a search warrant.  See United States v. Bailey, No. 06-CR-232 (JFB), 2010 WL 277069, at *11 (E.D.N.Y. Jan. 19, 2010).  In reaching this conclusion, the district court referenced "undisputed evidence at the trial that this door to the main house was not accessible to the basement tenant and that the main house was[ ]sealed off from the basement area."  Id. at *10.

### 4.    Appeal to this Court

Bailey appealed both the final judgment of conviction and the denial of § 2255 relief.  In affirming both, this court construed Michigan v. Summers, which permits officers executing a search warrant to detain persons on the premises, see 452 U.S. at 705, to support the detentions in this case because officers could have detained Bailey at 103 Lake Drive, and their "decision to wait until [he] had driven out of view of the house to detain him out of concern for their own safety and to prevent alerting other possible occupants was, in the circumstances presented, reasonable and prudent," Bailey II, 652 F.3d at 206. Accordingly, this court did not consider whether Terry v. Ohio might also have supported the challenged detention.

### 5. Supreme Court Review

The Supreme Court reversed this court's reliance on Summers to affirm the judgment of conviction. See Bailey III, 133 S. Ct. 1031. The Court explained that Summers was a "categorical" rule with a "spatial dimension." Id. at 1040, 1042. In short, a "spatial or geographical boundary can be used to determine the area within which both the search and detention incident to that search may occur." Id. at 1042. Thus, a detention incident to search is limited "to the area in which an occupant poses a real threat to the safe and efficient execution of a search warrant." Id. Whatever the outer limit of that area, the Supreme Court concluded that Bailey had crossed it when he traveled a mile from the subject premises. See id. ("[T]he decision to detain must be acted upon at the scene of the search and not at a later time in a more remote place.").

The Supreme Court observed that this did not mean that Bailey's off-site detention was necessarily unlawful. Rather, it meant that the detention's lawfulness was "controlled by other standards, including, of course, a brief stop for questioning based on reasonable suspicion under Terry." Id. Noting that the district court, "as an alternative ruling," had held that Bailey was lawfully stopped under Terry, the Supreme Court "express[ed] no view on that issue,"

16

and left the matter for further consideration by this court on remand: "It will be open, on remand, for the Court of Appeals to address the matter and to determine whether, assuming the <u>Terry</u> stop was valid, it yielded information that justified the detention the officers then imposed." <u>Id.</u> at 1043.[5]

We now explain why we conclude that <u>Terry v. Ohio</u> supported Bailey's initial stop, but not the police actions in placing him in handcuffs.

## II.     <u>Discussion</u>

### A.     <u>Stops Pursuant to *Terry v. Ohio*</u>

On remand from the Supreme Court, Bailey maintains that all evidence obtained from him before his formal arrest on July 28, 2005, was the fruit of an

---

[5] The quoted language plainly defeats Bailey's argument on remand that the Supreme Court "effectively concluded in its decision in this case" that Bailey's observed departure from the premises to be searched, "standing alone, did not give rise to reasonable suspicion" as required by <u>Terry</u>. Appellant's Supp. Br. 13. The Supreme Court made no <u>Terry</u> ruling, expressly deferring that issue to this court on remand.

Thus, when the Supreme Court observed at the start of its <u>Bailey III</u> opinion that "[t]he issue to be resolved is whether the seizure of the person was reasonable when he was stopped and detained at some distance away from the premises to be searched when the only justification for the detention was to ensure the safety and efficacy of the search," 133 S. Ct. at 1035, we understand it to have been framing the <u>Summers</u> inquiry that was the focus of its decision, not to be expressing a view that "this case should not be resolved on <u>Terry</u> grounds," as urged by Judge Pooler in dissent, <u>see</u> Dissenting Op., <u>post</u> at 1.

17

unlawful detention, and that Terry v. Ohio, 392 U.S. 1, warrants no different conclusion.

The Fourth Amendment recognizes "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. As this language indicates, "the ultimate measure" of the constitutionality of a government search or seizure is "reasonableness," Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652 (1995); accord Maryland v. King, 133 S. Ct. 1958, 1969 (2013), a matter generally determined by balancing the particular need to search or seize against the privacy interests invaded by such action, see Terry v. Ohio, 392 U.S. at 20–21. Thus, while "reasonableness" generally requires procurement of a judicial warrant based on probable cause, "neither a warrant nor probable cause . . . is an indispensable component of reasonableness in every circumstance." National Treasury Emps. Union v. Von Raab, 489 U.S. 656, 665 (1989).

In 1968, in Terry v. Ohio, the Supreme Court expressly recognized that government interests in "effective crime prevention and detection," as well as in officer and public safety while pursuing criminal investigations, could make it constitutionally reasonable "in appropriate circumstances and in an appropriate

18

manner" temporarily to detain a person and to pat him down for weapons "even though there is no probable cause to make an arrest." 392 U.S. at 22–25. The circumstances necessary to justify a Terry stop are a reasonable basis to think that the person to be detained "is committing or has committed a criminal offense." Arizona v. Johnson, 555 U.S. 323, 326 (2009). To support an accompanying patdown, there must be a reasonable basis to think "that the person stopped is armed and dangerous." Id. at 326–27.

A reasonable basis requires more than a "hunch." Terry v. Ohio, 392 U.S. at 27. Rather, it demands "specific and articulable facts which, taken together with rational inferences from those facts," id. at 21, provide detaining officers with a "particularized and objective basis for suspecting wrongdoing," United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks omitted).[6] The standard is "not high." Richards v. Wisconsin, 520 U.S. 385, 394 (1997) (discussing "reasonable suspicion" standard for no-knock warrants and citing

---

[6] Because "the subjective motivations of the individual officers . . . ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment," Graham v. O'Connor, 490 U.S. 386, 397 (1989), there is no reason for our dissenting colleague to be "troubl[ed]" that the detectives who stopped Bailey and Middleton thought they were engaging in a Summers detention, Dissenting Op., post at 15. Indeed, that subjective assessment is "irrelevant" to our own Terry inquiry. United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000).

Terry).  Notably, it is less than probable cause, requiring only facts sufficient to give rise to a reasonable suspicion that criminal activity "may be afoot" and that the person stopped "may be armed and presently dangerous."  Terry v. Ohio, 392 U.S. at 30 (emphasis added); accord United States v. Arvizu, 534 U.S. at 273 (collecting cases).  Moreover, while a reviewing court cannot merely defer to police officers' judgment in assessing reasonable suspicion, the court must view the totality of the circumstances "through the eyes of a reasonable and cautious police officer on the scene."  United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000) (internal quotation marks omitted).

Applying these principles here, we conclude that Bailey's initial stop and patdown were supported by articulable facts giving rise to a reasonable suspicion that he may have, and might still be, engaged in criminal activity and, moreover, might be armed.  Further, because Bailey's responses to initial inquiries after the stop only enhanced that suspicion, we conclude that it was reasonable under Terry for officers to detain him for the few minutes it took for a contemporaneous search of the subject premises to confirm those now-heightened suspicions.  At the same time, however, we conclude that police exceeded the permissible scope of a Terry stop when they handcuffed Bailey

20

after a patdown showed that neither he nor his companion Middleton was armed. Accordingly, evidence procured before handcuffing was not the product of an unlawful detention, but statements made by Bailey after handcuffing were tainted by this overly intrusive action.

B.     Bailey's Initial Stop and Patdown Were Reasonable Under *Terry*

Bailey's initial stop and patdown were supported by multiple articulable facts giving rise to a reasonable suspicion that he had been and was then engaged in criminal activity and might be armed.

First, at the time of the challenged stop, just over an hour after the police had obtained a warrant to search the basement apartment at 103 Lake Drive, the detectives already had probable cause—a higher standard than reasonable suspicion—to think that the apartment was the site of recent drug trafficking and contained a .380 caliber handgun.

Second, minutes before the stop, the detectives watched Bailey exit 103 Lake Drive through a gate that the police knew was accessible only from the rear basement level of the building.

These facts provided a reasonable basis to believe that Bailey had just left an apartment where criminal activity was conducted and where a .380 caliber

21

firearm subject to seizure was then located. See United States v. Villegas, 928 F.2d 512, 516 (2d Cir. 1991) (citing police observation of defendant at location of criminal activity "as evidenced by the issuance of a search warrant for the premises" as one factor supporting later Terry stop).

In urging otherwise, Bailey submits that his presence in the basement apartment was by no means obvious as it was possible for a person to travel from the building's upstairs apartment to its basement level rear door in exiting the premises from the gate. The law, however, does not demand that all possible innocent explanations be eliminated before conduct can be considered as part of the totality of circumstances supporting a reasonable basis to believe that criminal activity may be afoot. See United States v. Arvizu, 534 U.S. at 274–75 (holding that series of potentially innocent acts, taken together, could provide reasonable suspicion). Moreover, as we noted in Bailey II, the configuration of 103 Lake Drive made it "unlikely" that Bailey would have used the basement rear door to exit the upstairs apartment of 103 Lake Drive. 652 F.3d at 207. Thus, the officers' observation of the men's departure provided at least a reasonable basis to suspect that they had just left the basement apartment where there was probable cause to believe criminal activity was ongoing.

<u>Third</u>, the two men fit the informant's general description of "Polo," the individual from whom the informant had bought drugs in the basement apartment only days earlier, <u>i.e.</u>, each was a short-haired, stocky, black male. Judge Pooler submits that these facts cannot support reasonable suspicion, citing the high percentages of black residents in two Long Island towns and of overweight adults across America. <u>See</u> Dissenting Op., <u>post</u> at 10. This misses the point. While many men in the United States may fit the description of "Polo," it is the fact that Bailey and Middleton fit that description <u>and</u> had just left the very premises where "Polo" dealt drugs that provided an articulable basis (<u>i.e.</u>, more than a mere hunch) to suspect that one man or the other was "Polo" and, therefore, involved in criminal activity. Indeed, Judge Pooler acknowledges the "strong case [of criminal activity] mounted against the tenant at 103 Lake Drive." <u>Id.</u>, <u>post</u> at 18 n.4. Thus, when detectives observed two men who fit the description of the tenant "Polo" leaving the basement apartment, they had an articulable basis to conduct an investigatory <u>Terry</u> stop to ascertain the men's identities and their reason for being at a premises where there was probable cause to think criminal conduct was occurring and a gun was located. <u>See</u> <u>United States v. Salazar</u>, 945 F.2d 47, 50–51 (2d Cir. 1991) (holding that

23

"height, coloring, gender, and ethnicity" supported stop of person approaching residence referenced by confidential informant as site of criminal activity). Bailey attempts to distinguish Salazar by noting that the person stopped in that case displayed nervousness. See id. at 51. While this fact may have enhanced reasonable suspicion, it was not essential to it. In any event, as discussed below, here too there is an additional fact supporting reasonable suspicion to stop.

Fourth, the firearm that police had probable cause to think was in the subject premises was an easily transportable item of a sort frequently carried by drug dealers. See, e.g., United States v. Gaskin, 364 F.3d 438, 457 (2d Cir. 2004). These circumstances made it reasonable to suspect that one or the other of the men fitting the general description of the drug dealer "Polo" might be armed with the targeted weapon.

Insofar as Bailey suggests that the district court erred in locating support for its favorable Terry ruling in a statement in United States v. Jaramillo, 25 F.3d 1146 (2d Cir. 1994)—that "'[c]ircumstances giving rise to sufficiently 'specific and articulable facts' to warrant the stop and patdown of an individual' include[] 'an individual's ownership or occupancy of private premises for which a search warrant has been obtained,'" Bailey I, 468 F. Supp. 2d at 384 (quoting United

24

States v. Jaramillo, 25 F.3d at 1151) (second alteration added)—we here clarify that our own <u>Terry</u> analysis does not depend on <u>Jaramillo</u>. In any event, while <u>Jaramillo</u> includes the quoted language in a paragraph discussing <u>Terry</u> stops, it specifically supports the statement by citation to <u>Summers</u>. Thus, <u>Jaramillo</u> is properly understood to recognize that <u>Terry v. Ohio</u> and <u>Michigan v. Summers</u> provide distinct standards for reasonable stops, the first—on which we base our decision today—requiring reasonable suspicion of criminal conduct beyond[7] proximity to a location of suspected crime, and the second requiring spatial proximity to the premises to be searched without regard to reasonable suspicion.[8]

This, of course, comports with the Supreme Court's recognition in <u>Bailey III</u> that a stop not falling within the spatial limits of <u>Summers</u> might nevertheless be reasonable under <u>Terry</u>. <u>See</u> <u>Bailey III</u>, 133 S. Ct. at 1043. In sum,

---

[7] By "beyond," we do not suggest, as does our dissenting colleague, that proximity to a location subject to a search warrant is irrelevant to a reasonable suspicion determination. <u>See</u> Dissenting Op., <u>post</u> at 10. As noted <u>supra</u> at 21, our precedent recognizes such a fact as a permissible consideration under <u>Terry</u>. <u>See</u> <u>United States v. Villegas</u>, 928 F.2d at 516.

[8] Unlike Judge Pooler, then, we do not understand the district court's citation to <u>Jaramillo</u> to reflect "an incorrect view of the interactions between <u>Terry</u> and <u>Summers</u>." Dissenting Op., <u>post</u> at 17 n.3.

25

Jaramillo should not be read to suggest that ownership or occupancy of searched premises is necessarily enough to provide the reasonable suspicion necessary for a Terry stop while the search is conducted. At the same time, however, Bailey III cannot be read to bar any consideration of ownership or occupancy of premises to be searched in making a reasonable suspicion assessment under Terry.[9] Indeed, such a conclusion would be at odds with Supreme Court precedent instructing that reasonable suspicion be determined from the totality of circumstances. See United States v. Arvizu, 534 U.S. at 274.

For the reasons already stated, we conclude that the totality of circumstances known to the detaining detectives when they saw Bailey and Middleton leave 103 Lake Drive supported a reasonable suspicion to think that the men may have been engaged in criminal activity and were armed, thus making a stop and subsequent patdown constitutionally reasonable under Terry.[10]

---

[9] Although Bailey seemed to argue for such a bar in his supplemental brief, he abandoned the position at oral argument. See June 19, 2013 Oral Arg. Tr. 4:13–15 ("[W]e are not arguing today that an observed connection with the premises to be searched can't contribute to a finding of reasonable suspicion . . . .").

[10] Insofar as Judge Pooler suggests that the officers' suspicion of criminal activity was unreasonable because Cannaday's information about that site was already "several days old," Dissenting Op., post at 12, the contention cannot bear close

Brown v. City of Oneonta, 221 F.3d 329 (2d Cir. 2000), cited by Bailey to

question the detectives' reliance on race and generic physical characteristics,

warrants no different conclusion.  In dismissing a § 1983 equal protection claim

that certain police stops were impermissibly based on race, we observed that "a

description of race and gender <u>alone</u> will rarely provide reasonable suspicion

justifying a police search or seizure."  <u>Id.</u> at 334 (emphasis added).  At the same

time, however, we held that police could reasonably consider a victim's

description of a perpetrator's race "as one of several elements" in identifying

scrutiny.  First, the evidence Judge Pooler dismisses as "several days old" in fact
revealed the most recent in a series of approximately eight drug sales that "Polo"
had made to the informant over the past two months at either the 103 Lake Drive
apartment or "Polo's" prior Bay Shore residence, circumstances strongly
indicating ongoing—not stale—criminal activity.  Second, <u>Terry</u> does not
demand reasonable suspicion that the person stopped is currently engaged in
criminal activity.  Rather, a <u>Terry</u> stop may be based on reasonable suspicion that
the person "was involved in or is wanted in connection with a completed
felony."  <u>United States v. Hensley</u>, 469 U.S. 221, 229 (1985); <u>accord</u> <u>United States
v. Lucky</u>, 569 F.3d 101, 106 (2d Cir. 2009) (upholding <u>Terry</u> stop of vehicle that
matched description of automobile that <u>two days earlier</u> fled shooting).  Finally,
and most important, the warrant to search 103 Lake Drive issued because there
was probable cause to think that a firearm belonging to "Polo" and used in his
drug trafficking was <u>then</u> on the premises.  Thus, to the extent there was
reasonable suspicion to think that Bailey was "Polo," there was reasonable
suspicion to think that he was then in unlawful possession of the sought firearm,
constructively if not actually.  <u>See</u> <u>United States v. Chavez</u>, 549 F.3d 119, 129–30
(2d Cir. 2008) (upholding § 924(c) conviction for constructive possession of
firearm found in apartment from which defendant departed).

27

potential suspects for investigation.  Id. at 337–38.  This case falls into the latter category.  Police did not here stop men simply because they were black, or even because they were coincidentally seen at a location of suspected criminal activity. Cf. United States v. Swindle, 407 F.3d 562, 569 (2d Cir. 2005) (stating that it was unreasonable for officers searching for fugitive to order person earlier seen entering known drug house to pull over when "only obvious physical characteristic" the man shared with the fugitive "was the color of [his] skin" and "[the man] was five inches taller—and 70 pounds heavier—than [the fugitive]"). Rather, police here stopped the two persons whose race, sex, build, and hair were consistent with an informant's description of the man who had sold him drugs, and who were seen leaving the very premises where the reported drug sale took place and where police had probable cause to think that an easily transportable firearm used in the drug trafficking was then located.  It is the combination of these circumstances that provided the reasonable suspicion of ongoing criminal activity and weapon possession necessary for a Terry stop and patdown, and no different conclusion is warranted by either Bailey's or our dissenting colleague's efforts to view the facts in isolation.  See Dissenting Op., post at 4–10.  The Supreme Court has rejected such a "divide-and-conquer

28

analysis" because it "seriously undercut[s] the 'totality of the circumstances' principle which governs the existence <u>vel non</u> of 'reasonable suspicion.'" <u>United States v. Arvizu</u>, 534 U.S. at 274–75.

    C.    <u>The Reasonableness of Continued Detention</u>

Even if articulable suspicion supports an investigatory stop and patdown, the Fourth Amendment demands that the scope and duration of the detention be reasonable. In assessing whether a detention is too long or intrusive to be justified as an investigative stop, courts properly "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." <u>United States v. Sharpe</u>, 470 U.S. 675, 686 (1985); <u>accord</u> <u>United States v. Glover</u>, 957 F.2d 1004, 1011 (2d Cir. 1992); <u>see also</u> <u>United States v. McCargo</u>, 464 F.3d 192, 198–99 (2d Cir. 2006) (concluding that transportation of detainee to crime scene for possible identification was reasonable because it "could have immediately confirmed or dispelled whether he was a suspect").

Here, we deal with a stop lasting a total of ten minutes before police sufficiently confirmed their suspicions to arrest Bailey on undisputed probable cause. We conclude that such a brief detention did not exceed the permissible

29

scope of a <u>Terry</u> stop simply because, for its last few minutes, police were not questioning Bailey but, rather, were awaiting the results of a court-authorized search of the location from which Bailey was just seen to depart.

### 1. Questioning Incident to the Initial Stop and Patdown

At the outset, we observe that it was certainly within the reasonable scope of the initial stop and patdown for detectives (1) to remove hard objects from Bailey's pockets to ensure that they were not weapons, and (2) to ask him to identify himself and his residence. Indeed, Bailey effectively conceded at oral argument on June 19, 2013, that, if there was an articulable basis to stop him at all—which we conclude there was for the reasons just stated—such actions were reasonable. Thus, the evidence obtained during this phase of the stop—Bailey's statement of his name, his admission to residing at 103 Lake Drive, his production of a driver's license indicating his prior residence in Bay Shore, and the fact that he had a set of keys in his pocket—was all admissible at trial.

### 2. Retention of Bailey's Keys

Bailey contends that the police nevertheless exceeded the permissible scope of a <u>Terry</u> stop when they retained control of his keys,[11] placing them on

---

[11] These included both keys for the Lexus and a key to the subject premises.

the trunk of a car instead of returning them to him as they did his wallet. We think this argument depends on the reasonableness of Bailey's continued detention because as long as a person's detention remains lawful, he can hardly complain about police retaining control over his means of departing the scene. See United States v. Sharpe, 470 U.S. at 678–79, 687 & n.5 (upholding stop during which police officer detained vehicle and retained detainee's driver's license pending arrival of federal agent who, upon smelling marijuana from truck, seized keys and conducted warrantless search of vehicle resulting in arrest); see also United States v. $557,933.89, More or Less, in U.S. Funds, 287 F.3d 66, 87 (2d Cir. 2002) (Sotomayor, J.) (relying on Terry to uphold brief retention of luggage suspected of containing criminal proceeds "so that trained law enforcement personnel could investigate further . . . , especially when one considers that failing to have done so would likely have resulted in claimant and his money orders disappearing altogether"); United States v. Glover, 957 F.2d at 1009–12 (concluding reasonable suspicion permitted detention of suspect and his bus ticket, identification, and baggage, last of which was suspected to contain narcotics). Indeed, the quintessential Terry stop of a vehicle necessarily results in brief police control of the detainees' means to depart the scene. See generally

31

Arizona v. Johnson, 555 U.S. at 333 ("[A] traffic stop of a car communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will.").

We here conclude that Bailey's brief continued detention did not exceed the permissible scope of a Terry stop because the initial questioning enhanced suspicions of his criminal activities at the subject premises, and those suspicions were quickly confirmed by a contemporaneous search of that location. See United States v. Sharpe, 470 U.S at 686–87.

Bailey responded to Detective Sneider's initial questions by admitting that he presently resided at 103 Lake Drive. At the same time, he produced documentary evidence of past residence in Bay Shore. These facts strongly enhanced the likelihood that Bailey was "Polo," the person who was dealing drugs from the subject premises and who had recently done so at a prior Bay Shore residence. Even if these circumstances did not by themselves establish probable cause to arrest Bailey,[12] they made it entirely reasonable for police to

---

[12] We do not here decide whether the totality of facts known to the detaining detectives before the apartment search supported probable cause for Bailey's arrest because the government, at oral argument on June 19, 2013, specifically disavowed probable cause and argued only reasonable suspicion. See generally United States v. Moran Vargas, 376 F.3d 112, 114 (2d Cir. 2004) (declining to

detain him for the few additional minutes it took to use a readily available investigative means—execution of an already-procured search warrant at the suspected crime scene—to confirm or dispel suspicion of his ongoing criminal activity.

Bailey submits that such a conclusion would allow the government to do under <u>Terry</u> what the Supreme Court, in <u>Bailey III</u>, specifically said it could not do under <u>Summers</u>, <u>i.e.</u>, detain a person away from the premises pending a search.  In fact, <u>Bailey III</u> holds only that the <u>Summers</u> rule allowing persons to be detained incident to searches <u>without</u> probable cause or a reasonable basis to suspect their involvement in criminal activity is geographically cabined to the immediate vicinity of the search site.  <u>Bailey III</u> did not hold that a valid <u>Terry</u> stop of a person who <u>is</u> reasonably suspected of ongoing criminal activity at a location about to be searched could not be detained off site for the brief period it took to see if the search confirmed or dispelled those reasonable suspicions. Indeed, persons suspected of discarding criminal evidence are regularly detained pursuant to <u>Terry</u> while police search for the discarded item to confirm or dispel their suspicions.  See <u>United States v. Vasquez</u>, 638 F.2d 507, 523–24 (2d Cir.

address possible grounds to uphold warrantless search in light of government concession).

33

1980) (approving restraint of suspect to search shopping bag dropped at his feet and suspected of containing weapon); see also United States v. Caruthers, 458 F.3d 459, 468–69 (6th Cir. 2006) (upholding Terry stop while police searched area where detainee "was observed in a position suggesting that he was discarding what . . . might have been a gun"); United States v. Soto-Cervantes, 138 F.3d 1319, 1323 (10th Cir. 1998) (upholding Terry stop while police searched nearby area where detainee's furtive movements "could support an inference that the man had left to hide something upon spotting the officers"); United States v. Robinson, 30 F.3d 774, 779, 784 (7th Cir. 1994) (approving Terry stop for twenty to thirty minutes while police searched area for discarded contraband); cf. Michigan v. Summers, 452 U.S. at 700 n.12 ("If the purpose underlying a Terry stop—investigating criminal activity—is to be served, the police must under certain circumstances be able to detain the individual . . . 'while it is determined if in fact an offense has occurred in the area, a process which might involve checking certain premises, locating and examining objects abandoned by the suspect . . . .'" (quoting 3 LaFave, Search and Seizure § 9.2, at 36–37 (1st ed. 1978)). So here, we hold that a defendant reasonably suspected of criminal

activity at particular premises may be detained briefly pursuant to <u>Terry</u> while police lawfully search the premises to confirm or dispel that suspicion.

In urging otherwise, Bailey contends that because a lawful <u>Terry</u> stop must have an investigative purpose, detention while police pursue investigative means distinct from the stop—such as execution of an already procured search warrant for some other location—is necessarily unreasonable. The argument fails for two reasons.

First, Bailey's stop did have an investigative purpose: to ascertain his identity and his connection to the basement apartment at 103 Lake Drive. Bailey's responses to the officers' inquiries strongly indicated that he was "Polo," the person who was selling drugs and keeping a gun at the subject premises. Indeed, it was that evidence from the investigatory stop, when combined with the almost contemporaneous discovery of guns and drugs at the subject premises that provided probable cause to arrest Bailey for unlawful possession.

Second, we do not construe <u>Terry</u> or its progeny to hold, as Bailey appears to suggest, that an investigatory stop is reasonable only to the extent the detained person is himself a participant in the investigative means being employed. In the course of <u>Terry</u> stops, police routinely employ a range of investigative techniques

35

not limited to detainee questioning and not requiring detainee participation. See United States v. Place, 462 U.S. 696, 706 (1983) (upholding seizure of luggage to conduct dog sniff, "provided that the investigative detention is properly limited in scope"); United States v. Tehrani, 49 F.3d 54, 61 (2d Cir. 1995) (upholding stop while telephone inquiries conducted into suspects' immigration status); United States v. Glover, 957 F.2d at 1007 (upholding stop while computer check conducted of detainee's criminal history and luggage subjected to dog sniff). What reasonableness demands is not that a stop be limited to investigative means requiring the detainee's participation, but that police "diligently pursue[]" means of investigation "likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. at 686.

Here, the challenged stop lasted only ten minutes, during which time the combination of police questioning of Bailey at the stop scene and a police search of the premises he had recently departed established probable cause to arrest him for weapon and drug possession. We easily conclude that such circumstances demonstrate diligent pursuit of investigative means that quickly confirmed the reasonable suspicions supporting the stop. Accordingly, because

36

police acted within the permissible scope of a <u>Terry</u> stop when they detained Bailey for ten minutes, it was reasonable during that time to retain control over the keys that he would have needed to depart the scene.

Even if we were to identify Fourth Amendment error in the brief retention of Bailey's keys, we would conclude, as the district court did, <u>see</u> <u>Bailey I</u>, 468 F. Supp. 2d at 393 n.14, that the keys' seizure was inevitable given the reasonableness of Bailey's continued detention up until his lawful arrest. In such circumstances, we can conclude with a high level of confidence that, even without retention of Bailey's keys, police would have detained Bailey himself for the brief time it took to learn the results of the search of 103 Lake Drive; would have arrested Bailey upon discovery of drugs and a firearm in that premises; would have searched him incident to that arrest, <u>see</u> <u>Smith v. Ohio</u>, 494 U.S. 541, 543 (1990) (recognizing exception to warrant requirement for searches incident to arrest); and, in the course of that search, would have reclaimed custody of returned keys as evidence linking Bailey to the site of criminal activity. <u>See</u> <u>United States v. Heath</u>, 455 F.3d 52, 60 (2d Cir. 2006) (explaining that illegally obtained evidence can be admitted under inevitable discovery exception to exclusionary rule where court can find, with "high level of confidence," that each

of contingencies necessary to legal discovery of contested evidence would be resolved in government's favor); accord United States v. Vilar, 729 F.3d 62, 84 (2d Cir. 2013).

Accordingly, there is no merit to Bailey's challenge to the admission of the keys discovered and retained during the stop or of the fact that one of those keys fit the locks of the subject premises.

### 3. Exculpatory Statements After Handcuffing

The only remaining evidence whose admission is at issue is the statements Bailey made to Detective Sneider after he was handcuffed and told that the subject premises was being searched, i.e., that he did not live there, that nothing found therein was his, and that he was not cooperating with the investigation. Bailey contends that the statements are tainted by Fourth Amendment error insofar as it exceeded the permissible scope of a Terry stop to place him in handcuffs. We agree, but conclude that the admission of the challenged statements at trial was harmless.[13]

---

[13] Bailey also contends that it exceeded the permissible scope of a Terry stop to transport him to 103 Lake Drive, but because no challenged evidence was obtained as a result of the decision to transport Bailey in a patrol car to the subject premises rather than detaining him at the original location of the stop while the search of the premises was conducted, we need not address that argument.

### a. Fourth Amendment Error

To satisfy the Fourth Amendment's reasonableness requirement, "officers conducting stops on less than probable cause must employ 'the least intrusive means reasonably available' to effect their legitimate investigative purposes." United States v. Newton, 369 F.3d 659, 674 (2d Cir. 2004) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion)). The rule does not operate categorically to authorize or prohibit particular forms of restraint in conjunction with an investigatory stop. Rather, it demands a careful consideration of the circumstances in which challenged restraints were used. Courts conducting such an inquiry are, moreover, properly mindful of the Supreme Court's caution in Sharpe that,

> [a] creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, itself, render the search unreasonable. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

470 U.S. at 686–87 (internal quotation marks, alterations, and citation omitted).

With these principles in mind, courts have upheld a range of restraints incident to a Terry stop, from the patdown at issue in Terry itself, to the drawing

39

of firearms, to the use of handcuffs, all depending on the circumstances presented. See United States v. Newton, 369 F.3d at 674 (collecting cases). In sum, even though handcuffs are generally recognized as a "hallmark of a formal arrest," id. at 676 (collecting cases), not every use of handcuffs automatically renders a stop an arrest requiring probable cause to satisfy Fourth Amendment reasonableness, see id. at 675. The relevant inquiry is whether police have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat. See id. at 674.

We found these twin conditions satisfied in Newton, a case in which a defendant was handcuffed inside his home for the few minutes it took officers to search for and locate a firearm. See id. at 675. The officers were in the home in response to "a report that Newton illegally possessed a firearm and had recently threatened to kill his mother and her husband." Id. In "such a volatile situation," we concluded that it was objectively reasonable for officers to handcuff Newton until they had located and secured the gun. Indeed, we concluded that handcuffing was "a less intimidating—and less dangerous—

40

means of ensuring the safety of everyone on the premises than holding Newton at gunpoint during the search." Id.

Here, the police faced no comparable physical threat when they handcuffed Bailey. To the contrary, having already subjected both Bailey and Middleton to a patdown, the officers had confirmed that neither man was armed. Further, having had both men exit the stopped vehicle, the officers had eliminated the risk that the men might obtain any weapon from therein. We recognize that police were investigating drug trafficking and unlawful firearm possession, crimes frequently associated with violence. See United States v. Garcia, 339 F.3d 116, 119 (2d Cir. 2003) ("This Court has repeatedly acknowledged the dangerous nature of the drug trade and the genuine need of law enforcement agents to protect themselves from the deadly threat it may pose." (internal quotation marks and alterations omitted)). But just as the law does not categorically assume that handcuffing transforms every stop into an arrest, so the law does not categorically assume that every investigatory stop related to particular crimes requires handcuffing, particularly when a patdown outside a vehicle reveals the detainee to be unarmed. We do not foreclose the possibility that, in other cases, the government may be able to point to

41

circumstances supporting a reasonable basis to think that even an unarmed person poses a present physical threat or flight risk warranting handcuffing. We note only that the government failed to make such a showing in this case. Accordingly, we conclude that police here exceeded the reasonable bounds of a Terry stop when they handcuffed Bailey, a Fourth Amendment error that tainted statements procured immediately thereafter.

Nor is a different conclusion warranted simply because the statements here at issue were volunteered rather than in response to interrogation. Those circumstances may eliminate Fifth Amendment concerns, see Miranda v. Arizona, 384 U.S. 436, 478 (1966) (recognizing that "[v]olunteered statements of any kind are not barred by the Fifth Amendment"), but not necessarily Fourth Amendment taint, see generally Brown v. Illinois, 422 U.S. 590, 601–03 (1975) (holding that statements voluntarily made after Miranda warnings were nevertheless inadmissible as tainted by an unlawful arrest). To do that, the government must demonstrate that the statements were "an act of free will sufficient to purge the primary taint of the unlawful invasion." Kaupp v. Texas, 538 U.S. 626, 632 (2003) (internal quotation marks and alteration omitted). Factors relevant to that determination include (1) the flagrancy of the official

misconduct, (2) the temporal proximity between that conduct and the statement at issue, (3) the presence of intervening circumstances, and (4) the use of Miranda warnings. See Brown v. Illinois, 422 U.S. at 603–04. To avoid suppression, the factors, taken together, must demonstrate a significant "attenuat[ion]" between the Fourth Amendment violation and the challenged statement.

The Supreme Court found such attenuation in Wong Sun v. United States, 371 U.S. 471 (1963), a case in which a defendant arrested without probable cause was released on his own recognizance and days later confessed to certain crimes, see id. at 491. In those circumstances, suppression of the confession was not warranted because "the connection between the arrest and the statement had become so attenuated as to dissipate the [Fourth Amendment] taint." Id. (internal quotation marks omitted). Similarly, in Mosby v. Senkowski, 470 F.3d 515 (2d Cir. 2006), this court ruled on habeas review that a defendant's statements made after Miranda warnings and five hours after a defective arrest were admissible in light of "significant intervening circumstances between the warrantless arrest and the confession," specifically, the appearance of a witness who linked the defendant to the crime, id. at 522–23 (noting that unlawful arrest

would not be deterred by suppression because police questioned defendant only after critical witness had appeared).

In this case, however, the factors do not demonstrate significant attenuation. The handcuffing was not only an objectively excessive intrusion for this particular investigatory stop, but also the sort of restraint that a reasonable person would "normally associate[] with formal arrest." United States v. Newton, 369 F.3d at 676. Further, Bailey's statement followed within minutes, if not seconds, of the handcuffing, during which time he was not given Miranda warnings.

To be sure, Bailey was told that he was not under arrest, but only being detained while a search was conducted at 103 Lake Drive. But as we have had occasion to observe in making a Fifth Amendment assessment of custody, "telling a suspect that he is not under arrest does not carry the same weight in determining custody when he is in handcuffs as it does when he is unrestrained." Id. Translated to the Fourth Amendment context, we conclude that because of the conflicting signals implicit in telling a suspect he is not under arrest at the same time that he is being handcuffed—when, as here, handcuffing is the very action that takes a particular detention outside the scope of a

44

reasonable <u>Terry</u> stop—something more than a police disclaimer of arrest may be necessary to demonstrate that statements made within moments of the handcuffing were not tainted by that action. No different conclusion is warranted because Bailey's volunteered statements immediately followed the disclaimer's revelation of an ongoing search of the subject premises rather than his handcuffing. The record indicates that the sequence of events—handcuffing, Bailey's inquiry as to the rationale for arrest, police disclaimer of arrest and revelation of search, volunteered exculpatory statements—all followed so quickly one upon another as to preclude the finding of attenuation necessary to remove any taint.

Accordingly, in the absence of a record basis to conclude that the handcuffing exceeding the reasonable scope of a <u>Terry</u> stop in this case did not taint Bailey's exculpatory statements so as to allow their admission at trial, the motion to suppress these statements should have been granted.

b. <u>Harmless Error</u>

Where evidence obtained in violation of constitutional rights is wrongfully admitted at trial, the error can be deemed harmless only if it appears "beyond a reasonable doubt" that it "did not contribute to the verdict obtained." <u>Chapman</u>

45

v. California, 386 U.S. 18, 24 (1967); see United States v. Dhinsa, 243 F.3d 635, 659–64 (2d Cir. 2001).  The fact that wrongfully admitted evidence takes the form of exculpatory, rather than inculpatory, statements, does not by itself satisfy this standard.  See generally Miranda v. Arizona, 384 U.S. at 476–77 (rejecting distinction between inculpatory and exculpatory statements for purposes of Fifth Amendment analysis:  "If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution.").  Rather, a court must consider the importance of the erroneously admitted exculpatory statements to the government's proof of guilt in order to assess harmlessness.  See United States v. Quiroz, 13 F.3d 505, 510 (2d Cir. 1993) (rejecting harmlessness challenge to false exculpatory statements admitted in violation of Miranda, noting that "false exculpatory statement . . . may be an important part of the government's proof"), abrogated on other grounds by Berghuis v. Thompkins, 560 U.S. 370 (2010).[14]  A court must be able to conclude that the wrongfully admitted evidence was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record," to excuse the error as harmless.  Yates v.

---

[14] Berghuis holds that a suspect's invocation of his right to remain silent must be unambiguous.  See 560 U.S. at 381–82.

46

Evatt, 500 U.S. 391, 403 (1991), overruled on other grounds by Estelle v. McGuire,

502 U.S. 62 (1991); see United States v. James, 712 F.3d 79, 101 (2d Cir. 2013).

A number of factors properly inform this determination. "[M]ost critical"

is the strength of the prosecution's case absent the erroneously admitted

evidence. United States v. Okatan, 728 F.3d 111, 120 (2d Cir. 2011) (internal

quotation marks omitted). Also relevant are the materiality of the evidence to

critical facts in the case and the prosecutor's actions with respect to the evidence

at issue. See id. In this case, these factors tilt decisively in favor of harmless

error.[15]

First, even without Bailey's exculpatory statements, the prosecution had

evidence far more significant to its case against Bailey. See United States v.

Treacy, 639 F.3d 32, 45–46 (2d Cir. 2011) (holding erroneous admission of false

exculpatory statement harmless where "other evidence in the prosecution's case

was vastly more significant to demonstrating [defendant's] actual actions"); cf.

Wood v. Ercole, 644 F.3d 83, 94–96 (2d Cir. 2011) (citing weakness in prosecution

case in concluding under more stringent standard applicable to habeas review

---

[15] Judge Pooler concludes otherwise because she thinks all evidence procured during the stop was inadmissible. She does not, however, contend that if, as we conclude, the pre-handcuffing evidence was lawfully admitted, any error in admitting the post-handcuffing evidence was not harmless.

47

that admission of statements in violation of Fifth Amendment could not be deemed harmless). The prosecution case consisted of drugs, drug paraphernalia, guns, and ammunition found in the basement apartment at 103 Lake Drive—indisputable evidence of criminality at that location. As for Bailey's possession of the seized contraband—the only issue seriously in dispute at trial—the prosecution offered direct evidence from confidential informant Cannaday that he had purchased drugs from Bailey—whom he knew by the name "Polo"—seven or eight times over the two months prior to Bailey's arrest inside both the subject premises and at a prior Bay Shore residence, at which times he had seen a firearm present. While the defense challenged Cannaday's credibility, hostile witness Middleton corroborated Bailey's use of the name "Polo" and his residency in the Lake Drive basement apartment. Indeed, Middleton acknowledged being with Bailey in that apartment only minutes before police searched the premises and found the charged drugs and gun.[16] The prosecution

---

[16] Judge Pooler suggests that if Bailey's stop had "properly been deemed illegal," Middleton should not have been allowed to testify for the prosecution at trial because he "was only seized by the police as a result of the unlawful stop." Dissenting Op., post at 20 n.5. The point merits little discussion in light of our determination that the stop was not illegal. Nevertheless, we note that the urged suppression conclusion is hardly obvious. See United States v. Ceccolini, 435 U.S. 268, 278 (1978) (observing that because "cost of excluding live-witness testimony often will be greater" than cost of excluding other evidence that came

also offered evidence that, when Bailey and Middleton were stopped shortly after leaving 103 Lake Drive, Bailey admitted presently to residing there and produced a license indicating a Bay Shore address, facts that strongly established both his residency and control over the subject premises and his identity as the drug dealer "Polo." Further, a key found on Bailey's person at the time of the stop fit the locks of the subject apartment, and various documents found within the premises bore Bailey's name. The totality of this evidence provided compelling proof of Bailey's residency in, and control over, the basement apartment at 103 Lake Drive and, therefore, of his possession of the drugs and firearm found therein.

Second, the erroneously admitted exculpatory statements were plainly material insofar as they disclaimed Bailey's residency at 103 Lake Drive and his ownership of anything found therein. But, far from helping the prosecution, the

---

to light though chain of causation that began with illegal seizure, a "more direct link between the illegality and that kind of testimony is required"); see generally Herring v. United States, 555 U.S. 139–44 (2009) (explaining that exclusionary rule applies only where benefits of deterring sufficiently culpable police misconduct outweigh suppression's substantial costs). In any event, the issue is not properly before us in light of Bailey's failure to seek suppression of Middleton's testimony at trial, see Fed. R. Crim. P. 12(b)(3)(C) & (e), or to raise the issue either in his habeas petition or on this appeal, see United States v. Farhane, 634 F.3d 127, 155 n.29 (2d Cir. 2011).

49

admission of these exculpatory statements helped Bailey by allowing him to admit his own disclaimers of residency and possession before the jury, to argue the truthfulness of these disclaimers, see Summation Tr. 769:24–770:1, and, thus, to cast doubt on government proof of his earlier admission of residency, all without being subjected to cross-examination.[17]

More to the point, however, for Bailey's exculpatory statements to support, rather than undermine, the prosecution's case, the government first had to prove that Bailey's disclaimers were false, in which case it could then urge the jury to infer Bailey's consciousness of guilt. In this respect, Bailey's particular exculpatory statements, even if false, cannot be deemed particularly important to the prosecution case. This is not simply because false exculpatory statements "are only circumstantial evidence of guilt, and weak circumstantial evidence at that." United States v. Treacy, 639 F.3d at 45–46. Rather, it is because the sole value of Bailey's particular omissions lay in their falsity and the consciousness of

---

[17] Without the exculpatory statements, the jury would have heard only that, upon being stopped, Bailey admitted residing at the subject premises, which would have been in direct conflict with the defense theory, supported by the building owner, that Bailey was an occasional visitor of the real tenant of the premises. But with the exculpatory statements, the defense was able to argue that Bailey's disclaimer was the truth, as corroborated by the building owner, and that the police were mistaken, or deceitful, in their account of his initial admission of residency.

guilt that could be inferred therefrom.  See United States v. DiStefano, 555 F.2d

1094, 1104 (2d Cir. 1977) ("False exculpatory statements are not admissible as

evidence of guilt, but rather as evidence of consciousness of guilt."); accord

United States v. Strother, 49 F.3d 869, 877 (2d Cir. 1995).[18]  In short, this is not a

case in which the government offered a false exculpatory statement that also

contained damaging omissions, or otherwise locked the defendant into an

---

[18] The district court's charge was detailed and specific in this respect:

> You have heard testimony that the defendant made certain statements outside the courtroom to law enforcement authorities in which the defendant claimed that his conduct was consistent with innocence and not with guilt.
>
> The government claims that these statements in which he exonerated or exculpated himself are false.
>
> If you find that the defendant gave a false statement in order to divert suspicion from himself, you may, but are not required to, infer that the defendant believed that he was guilty.
>
> You may not, however, infer on the basis of this alone that the defendant is, in fact, guilty of the crime for which he is charged.
>
> Whether or not the evidence as to [] defendant's statement[s] shows that the defendant believed that he was guilty and the significance, if any, to be attached to any such evidence are matters for you, the jury, to decide.

Closing Tr. 105:9–106:1, App. 253–54.

implausible defense theory, circumstances precluding a finding of harmlessness. <u>Cf.</u> <u>Wood v. Ercole</u>, 644 F.3d at 96–97 (rejecting harmlessness in such circumstances on habeas review).

To prove falsity, the government had to convince the jury that Bailey did, in fact, reside in the subject premises and control, <u>i.e.</u>, possess, the charged contraband found therein. Thus, <u>before</u> the jury could consider Bailey's disclaimers as false exculpatory statements indicating consciousness of guilt, the government effectively had to prove his guilt. In such circumstances, erroneous admission of false exculpatory evidence can be deemed harmless beyond a reasonable doubt. <u>See</u> <u>United States v. Reifler</u>, 446 F.3d 65, 88 (2d Cir. 2006) (holding harmless admission of "plainly cumulative" evidence); <u>see also</u> <u>United States v. Durham</u>, 139 F.3d 1325, 1332 (10th Cir. 1998) (holding false exculpatory instruction harmless because it was of no relevance to jury until it determined that defendant knowingly made false exculpatory statement, and to make that determination, jury must have already independently concluded that defendant participated in charged crime); <u>United States v. Littlefield</u>, 840 F.2d 143, 150 (1st Cir. 1988) (holding consciousness of guilt instruction harmless because

52

consideration of evidence "would simply re-prove the conclusion the jury already had reached").

Third, the government's treatment of the exculpatory evidence only reinforces a conclusion of harmlessness. The prosecutor referenced the evidence twice in its opening summation and not at all in its rebuttal summation. See Summation Tr. 734:21–735:3, 743:5–19. Viewed in context, the references are more supplemental than critical to the government's theory of guilt. Certainly, the prosecutor did not begin his summation by suggesting that Bailey's false exculpatory statements were the starting point for the jury's understanding of the case; nor did he use the statements to buttress the testimony of the prosecution's own witnesses. Cf. Wood v. Ercole, 644 F.3d at 97–98 (rejecting harmlessness argument on habeas review where prosecutor used erroneously admitted statement in such ways). To the contrary, the prosecutor was careful to argue only that the statements could support an inference of consciousness of guilt if the jury found them to be false. See Summation Tr. 743:13–19. Because falsity depended on proof of defendant's residency and control of the subject premises and its criminal contents, matters which effectively established Bailey's guilt and undermined Bailey's affirmative case, and because the admissible

53

evidence of guilt was compelling, we conclude that Fourth Amendment error in the admission of Bailey's exculpatory statements was necessarily harmless.

## III.  Conclusion

To summarize, we conclude as follows:

1.  Bailey's initial detention on July 28, 2005, was a reasonable investigatory stop and patdown under Terry v. Ohio, 392 U.S. 1, because there was reasonable suspicion to think that he had been and was engaged in criminal activity and that he was armed.

2.  Insofar as police retained control over Bailey's keys while his detention continued for ten minutes,

   a.  the retention of means of departure is reasonable as long as the detention itself is reasonable;

   b.  a ten-minute detention here was reasonable under Terry because Bailey's responses to initial police inquiries only heightened the suspicion that prompted the initial stop and that suspicion could most quickly be confirmed or dispelled by the results of a then-ongoing search of the premises from which Bailey had just departed.  The spatial limitations of the

54

rule in <u>Michigan v. Summers</u>, 452 U.S. 692, which permits detention without reasonable suspicion pending execution of search warrants, do not categorically apply to the rule in <u>Terry v. Ohio</u>, which permits detentions only upon articulable facts supporting reasonable suspicion; and

c. even if retaining control of the keys had exceeded the limits of a reasonable <u>Terry</u> stop, any error would be harmless because the investigatory detention of Bailey himself remained reasonable until the time of his arrest, and police inevitably would have seized the keys when they searched Bailey incident to arrest.

3. Handcuffing Bailey after he was removed from his vehicle and a patdown confirmed that he was unarmed exceeded the bounds of a reasonable <u>Terry</u> stop in the circumstances of this case. Volunteered statements made by Bailey within minutes of that handcuffing were thus tainted by Fourth Amendment error and should not have been admitted at trial. Nevertheless, because the sole value of the statements to the prosecution was their falsity, which could only be

55

demonstrated by proof that also established Bailey's guilt, the admission was harmless beyond a reasonable doubt, and no vacatur for a new trial is required.

Accordingly, the judgment of conviction is AFFIRMED.

POOLER, *Circuit Judge*, concurring in part and dissenting in part:

As this case was described by the Supreme Court in *Bailey v. United States*, "[t]he issue to be resolved is whether the seizure of the person was reasonable when he was stopped and detained at some distance away from the premises to be searched when the *only* justification for the detention was to ensure the safety and efficacy of the search." 133 S. Ct. 1031, 1035 (emphasis added) ("*Bailey III*"). Such a justification is not appropriately used for a *Terry* stop, and this case should not be resolved on *Terry* grounds.

I believe that the initial stop was not supported by reasonable suspicion under *Terry*. And, while I concur with the majority that the police exceeded the bounds of *Terry* upon handcuffing Bailey and join in Part II.C.3.a. of the majority opinion, I would reverse for a new trial, untainted by the erroneously admitted evidence gathered from the initial stop and subsequent unlawful detention. For that reason, I respectfully dissent.

## I.

*Terry* permits a police officer in "appropriate circumstances and in an appropriate manner [to] approach a person for purposes of investigating possibly

1

criminal behavior even though there is no probable cause to make an arrest."

*Terry v. Ohio*, 392 U.S. 1, 22 (1968). However, police may only stop someone if there is "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks omitted). Reasonable suspicion must be "based on specific and articulable facts" and not on an "inchoate suspicion or mere hunch." *United States v. Bayless*, 201 F.3d 116, 132-33 (2d Cir. 2000) (internal quotation marks omitted). We consider the "totality of the circumstances of each case to see whether the detaining officer has a *particularized and objective basis* for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (emphasis added) (internal quotation marks omitted). "*Terry* explicitly recognized that specificity was essential in part because according the police unfettered discretion to stop and frisk could lead to harassment of minority groups and severely exacerbate police-community tensions." *Bayless*, 201 F.3d at 133 (internal quotation marks and alterations omitted).

## II.

In concluding that the detectives' initial stop of Bailey was supported by reasonable suspicion, the majority lists four "articulable facts" that it concludes warranted the intrusion at issue here: (1) that at the time of the challenged stop, the detectives already had probable cause "to think that the apartment [at 103 Lake Drive] was the site of recent drug trafficking and contained a .380 caliber handgun," **Maj. Op. at [21]**; (2) that the detectives watched Bailey leave the premises "through a gate that the police knew was accessible only from the rear basement level of the building," *id.*; (3) that both men fit the confidential informant's "general description of 'Polo,'" that is, a "short-haired, stocky, black male," *id.* **at [22]**; and (4) the firearm which was the subject of the search warrant was "an easily transportable item of a sort frequently carried by drug dealers," *id.* **at [24]**.

With its enumeration of these four facts, the majority concludes that the totality of circumstances "supported a reasonable suspicion to think that the men may have been engaged in criminal activity and were armed," making the stop reasonable under *Terry*. **Maj. Op. at [26].** In the next sections, I examine the

3

majority's facts regarding proximity to the premises and physical similarity to "Polo": first, whether these facts may provide independent justifications for a *Terry* stop, and next, whether they would justify a stop under the "totality of the circumstances." For the reasons discussed below, I cannot agree that this stop was justified under *Terry*.

## A.

As an initial matter, the majority's reliance on the detectives' observation of Bailey and Middleton leaving the subject premises—that is, factors (1), (2) and (4) cited by the majority—is not enough, without more, to justify a stop under *Terry*. The Supreme Court has repeatedly emphasized that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *see also United States v. Swindle*, 407 F.3d 562, 569 (2d Cir. 2005) ("Swindle's entering a known drug house does not itself suggest that a crime was afoot.").

In *Ybarra v. Illinois*, the Court explained that even in the context of a search authorized by search warrant, the "'narrow scope' of the *Terry* exception does not

4

permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, *even though that person happens to be on premises where an authorized . . . search is taking place*." 444 U.S. 85, 94 (1979) (emphasis added). Although *Ybarra* involved a search warrant authorizing the search of a tavern rather than a private residence, I believe that its holding that *mere* presence at the site of the execution of a search warrant does not create individualized, reasonable suspicion is applicable more broadly, particularly in light of the Court's emphasis on *Terry*'s carefully maintained "narrow scope." *Id.* at 93.

A number of other circuits have similarly concluded that presence alone in a suspicious area does not meet the requisite standard for reasonable suspicion under *Terry*. *See, e.g.*, *United States v. Black*, 707 F.3d 531, 542 (4th Cir. 2013) ("The pertinent facts remaining . . . are that the men were in a high crime area at night. These facts, even when coupled with the officers' irrational assumptions based on innocent facts, fail to support the conclusion that Officer Zastrow had reasonable suspicion that Black was engaging in criminal activity."); *United States v. Ritter*, 416 F.3d 256, 269 (3d Cir. 2005) ("Under *Ybarra*, [a] 'cursory search for weapons' clearly is not permitted absent a reasonable belief or suspicion that an

5

individual encountered is armed."); *United States v. Cole*, 628 F.2d 897, 899 (5th Cir. 1980) (evidence gathered via patdown search of an individual who arrived at a private home when the police were preparing to execute a search warrant was inadmissible because the search of the individual was not supported by reasonable suspicion, and "[m]ere presence neither obviates nor satisfies the requirement of *Terry*.").

This conclusion, that the detectives' observation of Bailey merely departing the subject premises is not enough for reasonable suspicion, is further buttressed by the Supreme Court's decision in this case. In rejecting our initial holding that Bailey's detention was justified under *Michigan v. Summers*, 452 U.S. 692 (1981), the Supreme Court acknowledged that:

> Although the danger of alerting occupants who remain inside may be of real concern in some instances, as in the case when a no-knock warrant has been issued, this safety rationale rests on the false premise that a detention must take place. If the officers find that it would be dangerous to detain a departing individual in front of a residence, they are not required to stop him. And, *where there are grounds to believe the departing occupant is dangerous, or involved in criminal activity, police will generally not need* Summers *to detain him at least for brief questioning, as they can rely instead on* Terry.

*Bailey III*, 133 S. Ct. 1031, 1039 (2013) (emphasis added). The Court noted that *Terry* is the appropriate doctrine on which to rely for police to detain a "departing occupant" away from the subject premises, and in so writing, the Court also emphasized that there must be "grounds to believe the departing occupant is dangerous, or involved in criminal activity," *id.*, in order to lawfully detain that occupant. It seems clear, based on the reasoning provided in *Bailey III*, that simply departing from a premises about to be searched, without more, cannot be enough to justify a *Terry* stop.[1]

Though the majority relies on its first, second, and fourth factors to support reasonable suspicion, a closer look at this list leads me to the conclusion that they are all variations on the same theme—i.e., that Bailey and Middleton were seen leaving 103 Lake Drive, and because of this, the police had reasonable suspicion

---

[1] The majority opinion seems to acknowledge this portion of *Bailey III* in reasoning that the *Summers* standard is "distinct" from *Terry*, and that *Terry* "requir[es] reasonable suspicion of criminal conduct beyond proximity to a location of suspected crime." **Maj. Op. at [25].** At the same time, however, the majority fails to recognize that most of the "articulable facts" on which it relies here are entirely dependent on spatial proximity to the subject premises about to be searched, and have nothing to do with reasonable suspicion of criminal conduct.

7

to stop them. The cases discussed above are clear that mere presence in a location known for criminal activity is insufficient under *Terry*, and thus, the "articulable facts" linking Bailey to the subject premises and relied on by the majority are similarly insufficient to create reasonable suspicion. Upholding the detectives' stop of Bailey in this case because of Bailey's presence leaving 103 Lake Drive would constitute an unwarranted expansion of *Terry*'s scope.

                                    B.

The remaining "articulable fact"—that both Bailey and Middleton resembled the confidential informant's description of "Polo"—also did not create a reasonable suspicion to stop them. This is because generic descriptions of race, gender, and build, without more, have been held insufficient to justify reasonable suspicion.

"[A] description of race and gender alone will rarely provide reasonable suspicion justifying police search or seizure." *Brown v. City of Oneonta*, 221 F.3d 329, 334 (2d Cir. 2000); *cf. Goodson v. City of Corpus Christi*, 202 F.3d 730, 733, 737 (5th Cir. 2000) (in a Section 1983 action where suspect was described as "white male, approximately six feet tall, heavy-set, and dressed like a cowboy, possibly

8

heading to a cowboy bar," the Fifth Circuit stated that "[s]uch a description would simply be too vague, and fit too many people, to constitute particular, articulable facts on which to base reasonable suspicion," and reversed the district court's grant of summary judgment). As the majority notes, race may properly be considered as one of several elements in identifying potential suspects for investigation, **Maj. Op. at [27]**, however, because I conclude that the factors related to Bailey's proximity to the subject premises were insufficient to create reasonable suspicion of criminal activity, we are left to consider the generic description of Polo's race, gender, and build (and description of his short hairstyle). This is simply insufficient, particularly where none of these descriptors are unique or remarkable, to give rise to the requisite individualized suspicion. *See Swindle*, 407 F.3d at 569-70 ("courts agree that race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop"); *cf. United States v. Jones*, 998 F.2d 883, 885 (10th Cir. 1993) (no reasonable suspicion to stop defendants where description was of two black men in a black Mercedes "based solely on the color and manufacturer of the car, and the fact that it contained two black men,"

9

particularly because there was no showing by the government that "the sight of two African-Americans in a black Mercedes was a highly unusual event").

Indeed, the facts we are left with apart from physical proximity to 103 Lake Drive—that Bailey and Middleton both shared race, gender, build and short hair styes with "Polo," in a part of Long Island where, as of 2006, approximately 78 percent of the population in the relevant neighborhood was black, and approximately two thirds of American adults were overweight—simply do not create a reasonable suspicion of involvement in criminal activity as to these particular two individuals.

## C.

Finally, properly taking all four of the majority's facts together does not change my view that this case does not fit within *Terry*'s narrow scope. Examining the totality of the circumstances, *see Arvizu*, 534 U.S. at 273, we are lacking the essential ingredient for a *Terry* case: that is, some conduct observed by an officer that would lead the officer to reasonably suspect that criminal activity may be afoot, i.e., in the process of development.

The majority relies on *United States v. Salazar*, 945 F.2d 47, 50-51 (2d Cir. 1991) to suggest that factors like those at issue here—descriptions of a suspect's height, coloring, gender and ethnicity, when combined with a person approaching a particular residence associated with criminal activity—are sufficient to support a *Terry* stop. **See Maj. Op. at [23].** However, in *Salazar*, our Court emphasized that the person stopped had appeared nervous in front of the police. 945 F.2d at 51. Understandably, nervousness, odd, or furtive behavior have all been identified by the Supreme Court as an important factor in the reasonable suspicion analysis, because such behavior in the presence of law enforcement is reasonably linked to criminal activity. *See Wardlow*, 528 U.S. at 124 ("In this case, . . . it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police. Our cases have . . . recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *see also Arvizu*, 534 U.S. at 270 ("The driver appeared stiff and his posture very rigid. He did not look at [Agent] Stoddard and seemed to be trying to pretend that Stoddard was not there. Stoddard thought this suspicious because in his

11

experience on patrol most persons look over and see what is going on, and in that area most drivers give border patrol agents a friendly wave.") (citation omitted); *Florida v. Royer*, 460 U.S. 491, 502 n.2 (1983) (plurality opinion) (the police noted, among the other facts cited as justifying reasonable suspicion, that Royer "appeared pale and nervous, looking around at other people").

In *Bailey III*, considering the specific facts of this case, Justice Kennedy enumerated several factors an officer might look to in order to lawfully detain a departing occupant under *Terry*. These included: "A suspect's particular actions in leaving the scene, including whether he appears to be armed or fleeing with the evidence sought." 133 S. Ct. at 1042. Here, there was no such evidence of suspicious or evasive behavior on Bailey or Middleton's part. For example, there was no testimony that Bailey or Middleton were moving quickly or furtively, or that the detectives suspected that they had just purchased or sold drugs at 103 Lake Drive, or that one of them was readjusting something in his waistband that could reasonably be considered a firearm. Further, the "criminal activity" that had been reported at 103 Lake Drive and that provided the basis for the warrant affidavit was several days old. The confidential informant's statement described

12

conduct occurring *days earlier*, and as such, did not describe activity that could provide "a *particularized and objective basis* for suspecting legal wrongdoing" at the time of the stop. *Arvizu*, 534 U.S. at 273 (emphasis added) (internal quotation marks omitted).

It is obvious that the detectives suspected that either Bailey or Middleton could be "Polo," the person whom the confidential informant had told them about. *See* App'x at 89-90 ("Q: And why did you follow them?" Officer Gorbecki: "To identify them and see what their purpose was for being at the residence."). While I concede that this testimony evinces the detectives' suspicion that one of these men could have been "Polo," that is not what the law under *Terry* requires to justify a stop. *Terry* requires that the facts giving rise to reasonable suspicion be addressed towards whether Bailey in particular was "engaged in wrongdoing *when they encountered him*." *Sokolow*, 490 U.S. at 7 (emphasis added); s*ee also Bayless*, 201 F.3d at 134 (the factors invoked by the police to justify a *Terry* stop must be salient with respect "to the question [of] whether crime is afoot").

The evidence here only showed that the confidential informant had identified someone named "Polo," along with "other persons unknown" as likely

13

occupants of the basement apartment, and that when the officers observed two men leaving the basement apartment—both of whom fit the generic details given by the confidential informant as to "Polo's" appearance—they believed that one of the men could be "Polo." However, instead of obtaining an arrest warrant, they decided to try to "identify them" and learn their "purpose" for being at the residence, all without particularized, articulable details as to why Bailey and/or Middleton were reasonably suspected of engaging in criminal activity at the time of the stop.[2]

Permitting a stop based on proximity to premises suspected of past criminal activity, together with mere similarity of gender, race, build and

---

[2] The majority's reliance on *United States v. Hensley*, 469 U.S. 221 (1985) for the proposition that a *Terry* stop may be permissible where there are facts giving rise to reasonable suspicion that a particular individual is wanted "in connection with a completed felony," *see id.* at 229, does not change the analysis here, in my opinion. *Hensley* involved the application of *Terry* to a named individual who had a "wanted flyer" issued against him for his participation in a specific armed robbery that had occurred a few days earlier. *Id.* at 223 ("We granted certiorari in this case . . . to determine whether police officers may stop and briefly detain a person who is the subject of a 'wanted flyer' while they attempt to find out whether an arrest warrant had been issued."). The Supreme Court was careful to limit *Hensley*, noting that "[w]e need not and do not decide today whether *Terry* stops to investigate all past crimes, however serious, are permitted." *Id.* at 227.

14

unremarkable hairstyle attributes, and without any perceived suspicious behavior, expands *Terry* beyond what the Supreme Court originally intended. That is to say, in cases "where a police officer observes *unusual conduct* which leads him reasonably to conclude in light of his experience that criminal activity may be afoot," limited investigatory stops and seizures are permissible under the Fourth Amendment. *Terry*, 392 U.S. at 30-31 (emphasis added). The facts here make this a close case, but they are simply not close enough.

III.

I also find troubling that the detectives' own testimony at the suppression hearing supports the conclusion that, contrary to the majority's position, they did not perceive *any* conduct giving rise to a suspicion of criminal activity. Rather, they wanted to detain Bailey and Middleton in order to bring them back to the premises that was to be searched, i.e., under a *Summers*-type detention. This is made clear by Detective Gorbecki's statement to Bailey, upon handcuffing him, that "[y]ou are not under arrest; you are being detained . . . We're about to execute a search warrant in your apartment." Detective Gorbecki testified that once he brought Bailey back to the residence, he met some of the entry team

15

officers in the driveway, and they confirmed "that there was a handgun in plain view next to the bed and some crack cocaine on a bookshelf," and it was at that point that Detective Gorbecki's view of why they were holding Middleton and Bailey changed:

> Q: [I]t changed from being a detention while the search warrant was being executed to what?
> A: Now it was an arrest.

When pressed on cross-examination about why the detectives did not stop or detain Bailey and Middleton on the premises, Detective Gorbecki responded that it was a "safety issue," and that "if we stopped them too close to the residence and there are still people in the apartment we'll search the individuals. If one of them finds out we did a search of the individuals, . . . they could prepare themselves with weapons." Detective Sneider described their actions by stating "[t]he procedure we follow is the same every time. . . . [I]f anyone leaves the house, we do not stop them next to the house. We let them leave the area, and then we detain them."

All of this testimony leads to the same conclusion: the detectives were effectuating a detention pursuant to *Summers*, and the district court concluded as

16

much, *see United States v. Bailey*, 468 F. Supp. 2d 373, 379-82 (E.D.N.Y. 2006) ("*Bailey I*"), as did this panel in our initial 2011 opinion. In fact, although the district court separately held that the stop could also be justified under *Terry*, the district court's reasoning upholding the stop on *Terry* grounds was supported by *Summers* jurisprudence, in that the district court relied on *United States v. Jaramillo*, 25 F.3d 1146 (2d Cir. 1994). In *Jaramillo*, our court allowed "an individual's ownership or occupancy of private premises for which a search warrant has been obtained" to give rise to "sufficiently specific and articulable facts" to warrant a *Terry* stop by relying on *Summers*. *Jaramillo*, 25 F.3d at 1151.[3] We know now that these holdings and rationales are incorrect. In *Bailey III*, the Supreme Court explained that, under *Summers*:

> detention is justified by the interests in executing a safe and efficient search, the decision to detain must be acted upon at the scene of the search and not at a later time in a more remote place. If officers *elect to defer the detention until the suspect or departing occupant leaves the*

---

[3] The majority opinion attempts to sidestep this analytical flaw in the district court's suppression ruling by noting that "we here clarify that our own *Terry* analysis does not depend on *Jaramillo*." **Maj. Op. at [24]**. However, this does not alter the fact that the district court's specific conclusions underpinning its denial of Bailey's suppression motion were in the context of an incorrect view of the interactions between *Terry* and *Summers*.

17

*immediate vicinity*, the lawfulness of detention is controlled by other standards, including . . . a brief stop for questioning based on reasonable suspicion under *Terry* or an arrest based on probable cause. A suspect's particular actions in leaving the scene, including whether he appears to be armed or fleeing with the evidence sought, and any information the officers acquire from those who are conducting the search, including information that incriminating evidence has been discovered, will bear, of course, on the lawfulness of a later stop or detention.

*Bailey III*, 133 S. Ct. at 1042 (emphasis added); *see also id.* at 1043 (Scalia, J., concurring) ("Bailey was seized a mile away. Ergo, *Summers* cannot sanction Bailey's detention. It really is that simple.").

The detectives in this case believed they were entitled to detain Bailey and Middleton away from the premises pursuant to the execution of the search warrant, i.e., under *Summers*. The Supreme Court has now clearly rejected this particular use of *Summers*-type detention, and our Court should not distort *Terry*'s narrow scope in an attempt to accommodate the detectives' conduct.[4]

---

[4] I find this all the more pertinent here, where the detectives clearly had a strong case mounted against the tenant at 103 Lake Drive, based on their work with the confidential informant and their lawfully obtained search warrant. This is not a situation in which the police were struggling to gather evidence, nor where they could not have waited and obtained an actual arrest warrant for the resident of the subject premises upon executing the search warrant.

"Beyond *Summers*' spatial bounds, seizures must comport with ordinary Fourth Amendment principles." *Id.* at 1045 (Scalia, *J.*, concurring). Because the record does not support a conclusion that the detectives had grounds to believe that based on Bailey and Middleton's "particular actions in leaving the scene," *id.* at 1042 (Opinion of Kennedy, *J.*), they were dangerous or involved in criminal activity, I believe the initial stop was not supported by reasonable suspicion, and as such, was not justified under *Terry*.

IV.

While I agree that the police exceeded the bounds of *Terry* upon handcuffing Bailey, I do not share the majority's conclusion that the erroneous admission of the post-arrest statements was harmless error. The admission of Bailey's post-arrest statements, when considered along with the evidence gleaned as a result of the initially unlawful stop, was not harmless.

The evidence obtained as a result of the stop and unlawful handcuffing consisted of Bailey's own statements confirming that 103 Lake Drive was his "house"; that his driver's license confirmed that he used to live at a Bayshore address; that Bailey's keys opened the basement apartment at 103 Lake Drive;

19

and Bailey's contradictory exclamation upon being handcuffed that "I don't live there. Anything you find there ain't mine, and I'm not cooperating with your investigation." Such evidence was clearly the type with which a jury could, and likely did, convict him. As such, the admission of the tainted evidence in this case does not give us any "fair assurance that the jury's judgment was not substantially swayed" by the erroneous admission of this evidence. *See United States v. Estrada*, 430 F.3d 606, 622 (2d Cir. 2005) (internal quotation marks omitted).

The bulk of the disputed facts at trial centered on whether Bailey was indeed "Polo," and whether it was Bailey who exercised control and possession of the subject premises. Without the evidence described above, the jury would have had on the one hand the identification made by the confidential informant, as well as his testimony at trial, and on the other hand, the testimony of the landlady, Meltona Sykes, that someone other than Bailey was the tenant who lived in and possessed the basement apartment at issue.[5] Certainly, the

---

[5] At trial, the jury also had the benefit of Middleton's testimony as a hostile witness, which further corroborated that Bailey was known as "Polo." However, Middleton was only seized by the police as a result of the unlawful stop, and as

20

confidential informant's testimony was both damning and highly relevant to Bailey's identification as "Polo."  But Bailey was entitled to a jury's consideration of the competing testimonial and identification evidence—and the respective factual inferences to be drawn from such evidence—without the prejudicial and improperly admitted evidence that indubitably and substantially swayed the jury's judgment.[6]

"[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967).  Considering in particular Bailey's own statements confirming 103 Lake Drive as his home, and that his keys (seized during the stop) opened the locks on the basement apartment, I cannot conclude that the error was harmless, i.e., that this wrongfully admitted evidence was

---

such, the police may not have had the benefit of his testimony had the stop properly been deemed illegal.

[6] Juries are generally instructed on witness credibility.  Without the benefit of the additional, improperly admitted evidence, the confidential informant's credibility, and his motivations for testifying on behalf of the government, may have been afforded significantly different weight, given that the jury heard testimony that the confidential informant's tip was given in exchange for "get[ting] [his] felony thrown out."

21

"unimportant in relation to everything else the jury considered on the issue in question." *Yates v. Evatt*, 500 U.S. 391, 403 (1991), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991).  I would hold that all of the evidence as a result of the stop and the unlawful detention should have been suppressed, and thus, I cannot join in the majority's conclusion of harmless error.  I would reverse and remand for a new trial.

V.

For all of these reasons, though I join in Part II.C.3.a of the majority opinion, I respectfully dissent from the remainder.