BARRINGTON D. PARKER, Circuit Judge,
dissenting:
The majority, by granting qualified immunity to Sergeant Anthony McVeigh and Officer Frank Farina of the Greenburgh, New York police department, absolves them of the arrest of Gregory Grice. Grice was an indisputably innocent 16-year old young man who was arrested while standing at a location where he had every right to be and doing what he had every right to do. The majority mischaracterizes Grice’s detention as a Terry stop. It was no such thing: it was an arrest and the facts that we are obligated to accept for purposes of this appeal establish that there was no probable cause for the arrest. Because McVeigh and Farina are not entitled to qualified immunity, I respectfully dissent.
I
Those facts establish the following. Grice is a train buff just like many others. As an aspiring engineer, he has an extensive knowledge of trains, attends public hearings of New York’s Metropolitan Transportation Authority (“MTA”), volunteers on Saturdays at a railway museum in Dan-bury, CT, and enjoys taking photographs *170 of passing MTA trains. This hobby led to his arrest.
On June 6, 2011, Grice left school and headed for a section of MTA train tracks, arriving around 4:30 p.m. at a train crossing in Greenburgh. He was familiar with the MTA’s rules and, as was- his habit, diligently followed them on that day. He had done this precise activity many times before. He had with him an MTA rule book as well as a letter from the MTA permitting him to take the photographs that led to his arrest. MTA personnel were quite familiar with him and were well aware of his penchant for photographing trains.
However, a passing motorist saw Grice, and, at 5:54 p.m., called the Greenburgh Police Department (“GPD”) to report a “suspicious” “mix race” male near the tracks. Joint App’x (“JA”) 521-24. At 5:57 p.m., the GPD dispatcher radioed out an (incorrect) description of the individual seen by the motorist: “a male white, wearing a red shirt bending down by the tracks with, a remote control object in his hands.” JA 524. McVeigh heard that dispatch and, minutes later, at 6:03 p.m., arrived at Grice’s location. What he witnessed differed from the dispatcher’s report. Grice is black, not white, had no “remote control,” and was not trespassing but was well back from the tracks.
McVeigh, in order to determine what was occurring, engaged Grice, who immediately informed McVeigh that he was “just taking pictures,” a fact easily corroborated by the fact that Grice had a camera rather than a “remote control” device the dispatch reported or a bomb. JA 555. Grice’s statements to McVeigh further corroborated the innocent nature of Grice’s presence near the tracks: “I’m a rail fan like everybody else,” and “I always keep myself at a safe distance.” ,JA 558. Moreover, contrary to the majority’s view, Op. at 175, McVeigh need not have taken Grice at, his word; Grice offered McVeigh evidence establishing that his acts were innocent. Grice promptly told McVeigh: “I have a letter I e-mailed the MTA and they said [what I am doing] is okay. I can show you the letter. It’s in my bag.” JA 558. Grice even told McVeigh he could “take [the letter] out of my bag.” JA 558, For whatever reason, McVeigh chose not to retrieve or review the e-mail, even though officers who had stopped Grice in the past had any suspicions they may have had alleviated by reviewing that letter. JA 565, 578-79.
About two minutes later, without any meaningful inquiry and having seen nothing illegal or suspicious,[1] McVeigh handcuffed Grice, ostensibly for “my safety and your safety.” JA 559. It is clear that handcuffing in these circumstances constituted an arrest. The law of our Circuit is that “handcuffs are generally recognized as a *171 hallmark of a formal arrest.” U.S. v. Bailey, 743 F.3d 322, 340 (2d Cir. 2014). McVeigh then required that Grice sit on the ground and proceeded to question him extensively and aggressively.[2] It is not possible rationally to conclude that these circumstances constituted anything other than an arrest. After all, Grice was under the most complete measure and method of restraint that McVeigh had available to him and no one could believe that Grice was free to leave. No opinion of our Court has ever held that handcuffing for the period of time experienced by Grice and behaving in the way he behaved was not an arrest.
Other GPD officers shortly came on scene, including Officer Frank Farina. They were followed by officers of the MTA, who arrived shortly-thereafter and immediately recognized Grice as the hobbyist with whom they were familiar. See JA 597 (MTA Officer Hosein, for example, stated that he had “seen [Grice] around a million times before”). Nevertheless, the MTA officers investigated the scene and determined that Grice posed no threat. JA 334-35. McVeigh and Farina acknowledge that while Grice was detained, it became clear to them that Grice posed no threat of violence or train interference. JA 470, 477, 502.
Although McVeigh initially fold Grice he was being detained for his protection, after it became clear that Grice posed no threat, McVeigh and Farina changed their story. McVeigh subsequently justified the detention exclusively on the basis that-he suspected that Grice had trespassed on the tracks, JA 470, and Farina joined McVeigh’s new version. Farina responded to Grice’s inquiry about what he did wrong not by mentioning anything of safety, , but by saying, “[y]ou’re trespassing.” JA 5. However, McVeigh and Farina had no first-hand basis to conclude that Grice trespassed. McVeigh and Farina’s suspicion of trespass was based only on the unverified and unsworn report of-an absent 911 caller (which was clearly insufficient to establish probable cause for trespass).
The majority ignores this changing rationale for Grice’s • detention. Specifically, the majority asserts that “McVeigh released Grice from his handcuffs as soon as the MTA finished its investigation .of the tracks.” Op. at 168; see also Op. at 166 (McVeigh released Grice “[w]hen the search [for a bomb] turned up nothing”). However, McVeigh’s testimony and Farina’s statement to Grice belie that assertion. See JA 470, 573.
In contrast to the majority’s view, it was nQt until -well after McVeigh and Farina were aware that Grice posed no threat to the tracks that McVeigh removed his handcuffs from Grice. Yet, rather than release Grice, McVeigh handed over custody of Grice to MTA officers based on McVeigh’s newly minted trespass theory. *172 To justify doing this, McVeigh told the MTA that when he arrived he personally saw Grice standing on the tracks. JA 471. This version sharply contrasts with that of Grice who asserts that he was never on the tracks and never closer than 12 to 15 feet from them. Accepting those facts as true and drawing every inference in Grice’s favor, as we must, requires us to assume for qualified immunity purposes that McVeigh’s statement to the MTA police about Grice’s location on the tracks was not true. McVeigh’s fabrication is significant because the record makes clear that the sole basis for the MTA’s decision to keep Grice in custody and charge him with suspicion of trespass was McVeigh’s report. See JA 520. Unsurprisingly, the trespass charge was later dropped, given there was no credible evidence to conclude Grice ever trespassed.
Having been cleared of all wrongdoing, Grice sued all involved. Most defendants settled. McVeigh and Farina did not. After extensive discovery, and despite McVeigh and Farina’s objections that they were protected by qualified immunity, the district court denied summary judgment on the ground that there were factual disputes requiring a trial. The majority reverses that decision. I would not.
II
I begin by noting that today’s decision oversteps our jurisdiction. No final decision was entered below, a fact which would ordinarily preclude our review. See 28 U.S.C. § 1291. However, under certain conditions we may review the denial of a summary judgment motion when that motion was based on a claim of qualified immunity. See Plumhoff v. Rickard, — U.S. -, 134 S.Ct. 2012, 2019, 188 L.Ed.2d 1056 (2014). In determining whether we may assert jurisdiction in such a case, the “critical issue is whether the interlocutory appeal raises purely legal questions.” Loria v. Gorman, 306 F.3d 1271, 1280 (2d Cir. 2002). And, generally, “an order denying summary judgment based on a determination of ‘evidence sufficiency’ does not present a legal question.” Plumhoff, 134 S.Ct. at 2019 (citing Johnson v. Jones, 515 U.S. 304, 314, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995)).
McVeigh and Farina invoke a narrow exception to this rule in which “a defendant asserting qualified immunity has agreed to be bound by the plaintiffs version of the facts [and] the issues [therefore] become purely legal.” Loria, 306 F.3d at 1280. It is well settled that this avenue is available only where appellants are “willing to accept plaintiffs version of the facts for purposes of the appeal.” Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003); see also Loria, 306 F.3d at 1280. In addition, we must “disregard so much of [defendant’s] version as is contrary to plaintiffs version.” O’Bert v. Vargo, 331 F.3d 29, 39 (2d Cir. 2003). Neither McVeigh or Farina nor the majority accept Grice’s version.[3]
*173 Once we assume for purposes of this appeal Grice’s version of the facts, we are dealing with a record that establishes the following, (i) Grice was at all times where he had every right to be and was doing what he had every right to do; (ii) Grice had evidence, previously accepted by the police, which established his innocence and that evidence was made available to McVeigh at the outset of the encounter; (iii) Grice never engaged in any threatening, unsafe, or suspicious behavior, and was at all times calm and cooperative; (iv) Grice never trespassed, nor did McVeigh or Farina have any first-hand basis to conclude that he did; (iv) yet, once it became clear that Grice posed no terrorist threat, McVeigh told the MTA police that he saw Grice trespassing. The majority in large part ignores these elements of Grice’s story, and turns instead to the contradictory version presented on appeal by McVeigh and Farina. The majority, without discussion, condones this bait-and-switch. I would not.
Ill
Turning to the merits, I agree that McVeigh had sufficient suspicion for a Terry stop and, indeed, he would have been derelict had he not inquired as to what Grice may have been doing. But Grice’s detention was not a Terry stop, but an arrest. A Terry stop consists of a police officer’s brief detention of an individual for questioning when that officer has “a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity.” U.S. v. Padilla, 548 F.3d 179, 186 (2d Cir. 2008) (internal quotation marks omitted). In comparison to an arrest, a Terry stop “is an intermediate response allowing police to pursue a limited investigation when they lack The precise level of information necessary for probable cause to arrest.” Id. (internal quotation marks omitted). A Terry stop must be as minimally intrusive as possible, bearing in mind the circumstances that gave rise to the suspicion. U.S. v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995).
In certain situations, a Terry stop ripens into an arrest. Under the law of this Circuit, the following factors determine whether that occurs:
the amount of force used by the police, the need for such, and the extent to which an individual’s freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.
U.S. v. Vargas, 369 F.3d 98, 101 (2d Cir. 2004). Handcuffing is especially important. It is well settled that handcuffs are a hallmark of a formal arrest. New York v. Quarles, 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); U.S. v. Newton, 369 F.3d 659, 676 (2d Cir. 2004); see also U.S. v. Polanco, 2011 WL 240140, at *7 (S.D.N.Y. Jan. 19, 2011) (handcuffing is “a maximal intrusion under the Fourth Amendment” (citing U.S. v. Ceballos, 654 F.2d 177, 180-81, 184 (2d Cir. 1981)).) Because every one of these factors points to an arrest and not to a Terry stop, I easily conclude that Grice was arrested.
*174 .The cases on which the majority relies to establish that Grice’s detention was a simple Terry stop, rather than an arrest, despite his lengthy handcuffing are far off point. In Newton, a Fifth- Amendment case, police officers responded to a specific “import that Newton illegally possessed a firearm and had recently threatened to kill his mother and her husband.” 369 F.3d at 675. Given “such a volatile situation,” we held that a “certainly brief’ handcuffing that “last[ed] only the few minutes it took the officers to locate the sought-for firearm” did not constitute an arrest. Id. Vargas is similar. There, police officers responded to a report that Vargas was carrying a gun in his waistband. When the officers arrived on the scene and identified themselves, Vargas “immediately turned and fled.” 369 F.3d at 100. The officers' gave chase, and “[a]fter a brief struggle, [Vargas] was placed on the ground, handcuffed and patted down,” a pat down which resulted in the officers quickly finding a loaded gun. Id. On appeal, we rejected Vargas’ fanciful argument that he was under arrest during the “very brief’ period between .the placing of the handcuffs and the discovery of the weapon. Contrary to the-majority’s intimation, neither Newton nor Varyas .stand for a broad exception that removes this case from our general- rule that “handcuffs are generally recognized as a hallmark of a formal arrest.” Bailey, 743 F.3d at 340.
The majority’s reliance op Tehrani, Newton and Vargas to highlight that the length of the arrest was reasonable is similarly irrelevant to this case. After all, in determining the permissible time frame for a Terry stop, the Supreme Court has explained that “we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.” U.S. v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); accord U.S. v. Glover, 957 F.2d 1004, 1011 (2d Cir. 1992); see also U.S. v. McCargo, 464 F.3d 192, 198-99 (2d Cir. 2006). Thus, where there has been “delay unnecessary to the legitimate investigation of the law enforcement officers” then the detention cannot be justified under Terry and be-comés a de facto arrest. Sharpe, 470 U.S. at 687, 105 S.Ct. 1568. In the three cases cited above, the police had no alternate means of dispelling their suspicions without a lengthy detention. In contrast, here, had the officers simply agreed to look at the letter in Grice’s bag after handcuffing him, their suspicions would have been dispelled almost immediately. .
In thé- teeth of the myriad facts establishing that Grice was arrested, the majority maintains that it was a Terry stop. After acknowledging that “[handcuffing is ordinarily not incident to a Terry stop, aná tends to show that a stop has ripened into an arrest,” Op. at 167, the majority concludes that generalized terror concerns permit it to ignore the constitutionally grounded distinction between a Terry stop and an arrest. After all, the majority says, terrorists can “press a detonator button on any electronic device.” Op. at 168,
The majority then proceeds to riff on this observation, listing instances of' the use of cell phones by térrorists. See Op. at 169 n. 2. But if a generalized fear of terrorism coupled with the possession of a cell phone is sufficient to justify an arrest, then our Fourth Amendment is in real jeopardy. Practically every American now has a cell phone. As of 2017, there are more cell phones in America than Americans. Specifically, in a population of 326,-776,164 there are 396,000,000 cell phones in use today or roughly 1.2 devices for *175 every person in the country.[4] Our government is not entitled to use vague, unsubstantiated reports of disorder or terror to justify an arrest. That is why we have a Fourth Amendment.
In any event, the fact that some terrorists use cell phones is beside the point. McVeigh should have easily and quickly determined that Grice was a train buff, not a terrorist. As we have seen, Grice had on his person correspondence with the police corroborating his explanation of what he was doing.
Notwithstanding our law that handcuffing is the “hallmark of an arrest,” the majority concludes that Grice’s handcuffing did not constitute an arrest because “McVeigh’s intent [was] to handcuff Grice for protection rather than pursuant to arrest.” Op. at 168. None of this is correct. Because McVeigh lacked probable cause to arrest Grice, he had no legal right in these circumstances to handcuff Grice for Grice’s protection. And because McVeigh had no basis whatever to believe that Grice was either armed or dangerous, he had no right to handcuff Grice for McVeigh’s protection. Handcuffs are not a tool that police officers can casually use whenever they choose. Their use is hot justified because it is a easy or convenient way for the police to go about their business. As our case law makes clear, handcuffing is a significant intrusion on a citizen’s dignity and liberty.
The majority’s reliance on “McVeigh’s intent” is misplaced. Intent is irrelevant. Whether one is arrested is “an objective inquiry [that] pointedly eschews consideration of intent.” Gilles v. Repicky, 511 F.3d 239, 245 (2d Cir. 2007) (internal quotation marks omitted).. Accordingly, McVeigh’s “subjective intent does not calculate into the analysis of when [Grice was] arrested.” Vargas, 369 F.3d at 101. Rather, “[t]he intent that counts under the Fourth Amendment is the intent that has been conveyed to the person confronted.” Brendlin v. California, 551 U.S. 249, 260-61, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007); see also Yarborough v. Alvarado, 541 U.S. 652, 662, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). Consequently, we do not ask on what subjective basis McVeigh actually handcuffed Grice, we ask whether there was an objectively “reasonable basis. to think that [Grice] pose[d] a physical threat and that handcuffing [was] the least intrusive means to protect against that threat.” Bailey, 743 F.3d at 340. The answer is, .of course, no.
Nevertheless, the majority both improperly credits McVeigh and Farina’s contention that they subjectively intended only to detain Grice for his protection, and that they had an objectively reasonable concern for safety. McVeigh and Farina acknowledge that they detained Grice at least in part because they suspected he committed a crime, a fact told to Grice while he was handcuffed. As discussed, McVeigh testified that while Grice was. handcuffed he became convinced that Grice posed no threat, but that he did not release him because he suspected Grice committed an unlawful trespass. Specifically, McVeigh was asked at deposition “why wasn’t [Grice] let go ... [a]t the point you determined he didn’t do anything harmful[?].” JA 470. McVeigh responded: “We have him for criminal trespass.” JA 470. Likewise, when Grice stated to Farina that he had done nothing wrong, Farina responded, “[y]ou’re trespassing.” JA 573. Thus it was expressly conveyed to Grice that he was being detained on suspected criminali *176 ty, not for protection. The majority ignores this point entirely, yet it conclusively shows that, at the very least, Grice was under arrest (for trespass) at the point at which McVeigh had cleared Grice as any sort of danger to “my safety and your safety.” JA 559. We should take McVeigh and Farina at their word: their basis for handcuffing Grice was not, as the majority asserts, for protection, but incident to Grice’s arrest for trespassing.
More fundamentally, the facts we are obligated to accept demonstrate that there was never an objectively reasonable basis to view Grice as any sort of threat. This is especially so given the credible and quickly and easily verifiable explanation Grice provided for his presence and his conduct. In other words, McVeigh and Farina’s highly generalized terrorism fear is a completely insufficient basis for dispensing with a showing of probable cause.
IV
The majority rests its opinion entirely on its conclusion that Grice was the subject of a valid Terry stop supported by reasonable suspicion. Because it concluded Grice was not arrested—a necessary element of Grice’s claims for false arrest, failure to intervene, and supervisory liability—it felt no need to assess whether McVeigh and Farina had probable cause, the other core question underlying Grice’s claims. I need engage no prolonged discussion on this question because my views make clear that I would easily conclude that McVeigh and Farina lacked probable cause to arrest Grice. I would therefore send each of Grice’s claims to a jury.
Grice’s false arrest claim should survive because there was no probable cause to arrest Grice in relation to supposed train interference. And, even if there were, the claim would still lie because McVeigh and Farina continued their detention of Grice after they cleared him of any threat to the tracks. We have made clear that probable cause “dissipates” where “a police officer’s awareness of the facts supporting a defense ... eliminate[s] probable cause.” Jocks v. Tavernier, 316 F.3d 128, 135, 137-38 (2d Cir. 2003); see also Gilles, 511 F.3d at 247. Here, any justification for Grice’s arrest was dissipated by the information provided McVeigh by the other officers.
I would also hold McVeigh and Farina to account for them role in the MTA’s detention of Grice. I would do so for two reasons: (i) a police officer is liable for false arrest where, as here, it was reasonably foreseeable that his misconduct (i.e., McVeigh’s false report to the MTA) would “contribute to an ‘independent’ decision that results in a deprivation of liberty,” Higazy v. Templeton, 505 F.3d 161, 177 (2d Cir. 2007); Kerman v. City of N.Y., 374 F.3d 93, 126-27 (2d Cir. 2004); and (ii) a failure to intervene claim lies where a “police officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers,” Ricciuti v. N.Y.C. Trans. Auth., 124 F.3d 123, 129 (2d Cir. 1997) (internal quotation marks omitted). Finally, I would conclude that a triable question of fact remains as to whether Farina should be liable on a supervisory liability claim.
At a trial, McVeigh and Farina could well be exonerated by a jury that has been presented with the relevant facts. A jury could conclude that, given the circumstances the officers faced, they acted appropriately. Juries very frequently reach just this result. But where, as here, the record is pock-marked with contradictions, whether the officers are entitled to exoneration should be determined by a jury selected from the community the officers are committed to serve and not by judges dealing with a record such as this one.
*177 For these reasons, I would affirm the district court.

. The majority summarily states that “McVeigh was unaware of any plausible innocent reason that could explain why someone would be taking photos of trains and listening to the railroad's radio broadcasts.” Op. at 167. It is unclear to me how the majority can make this statement when we are to assume the truth of Grice’s story, which is that there are “thousands” of rail fans just like him. JA 566; see also JA 558 (Grice telling McVeigh that he is “a rail fan like everybody else”). The necessary inference from that record evidence is that taking photos of trains is fairly common and that therefore McVeigh did in fact have reason to understand what Grice was doing. Moreover, any pre-handcuffing lack of awareness of the innocence of Grice’s behavior is of McVeigh’s own making. He for some reason chose not to review (he MTA’s letter giving Grice express permission to do what he was doing. Had McVeigh reviewed that letter—which, in my view, any reasonable officer would have done—he would have been quite aware of a “plausible innocent reason” that Grice was by the tracks,

. McVeigh contends that his treatment of Grice was warranted because he believed Grice might have been a terrorist. McVeigh contends that "[s]ince 9/11 terrorism is a big concern in mass transit.” JA 215. McVeigh and Farina introduced six documents (totaling 11 pages) received by the GPD supporting the existence of terrorist threats. Three describe highly general nation-wide threats posed by al-Qaida. JA 96-100. Another is a brief description of an incident that occurred at a railroad crossing nearly 50-miles away in which a "homemade device” was found on the tracks that had no "impact to rail operations” other than causing an electrical circuit to break. JA 101. The report does not indicate what the device was or whether it was put on the tracks intentionally. Nothing in the record connects the device to any terrorist activity. Finally, the last two are MTA police department alerts which are irrelevant because they are dated well after the incident with Grice. JA 102-04. .

. The fact that we do not accept appellants’ representation as to what facts they agree to is especially important here. Although McVeigh and Farina purport to accept Grice’s facts in order to get before this court, they in fact do not do so. In their reply brief, McVeigh and Farina concede that Grice “was detained for 45-50 minutes, in handcuffs, even though he was no closer than 12-15 feet from the train tracks.” Reply Br. of Appellants at 1-2. Despite this purported concession, appellants presented numerous other disputed facts. For example, the briefs differ on whether Grice had a scanner in-hand on McVeigh’s arrival on scene. Compare Br. of Appellants at 9 n.4 with Br. of Appellee at 7. McVeigh and Farina's counsel also offered disputed highly relevant facts at oral argument. Specifically, he adamantly argued that the decision by the MTA to charge Grice with trespass was motivated by the motorist's report, rather than information from McVeigh. *173 See Oral Arg. Recording at 32:15. This assertion directly contradicts Grice’s version of the facts, namely, that the MTA “issued the summons based on information provided ... by McVeigh.” Br. of Appellee at 11. Counsel's contradiction of this point is especially striking given that Grice’s view is readily supported by the record. MTA Sergeant Heagle testified that he would not have made the arrest had “McVeigh originally saw [Grice] in a non-trespassing area.” JA 520.

. CT IA-T he Wireless Association, Everything Wireless, Wireless Snapshot 2017 (2017), https;//www.ctia.org/docs/default-source/ default-document-libraiy/ctia-wireless-snapshot.pdf. '